In the Matter of THOMAS J. O'NEILL, an Attorney, Respondent.

First Department, July 11, 1918.

Attorney at law — disbarment — employment of persons not attorneys to procure claims — causing non-resident to acquire fictitious residence in this State for purpose of bringing suit — evidence — proceeding not criminal — right of defendant to claim constitutional privilege — inferences from refusal to testify.

Charges against an attorney at law, engaged almost exclusively in litigation growing out of claims for personal injuries or death, of employing persons not attorneys to solicit claims and of causing a non-resident claimant to acquire a fictitious residence in this State for the purpose of bringing suit and of paying him for his support and expenses pending the determination of the suit, dismissed for lack of proof.

A proceeding to discipline an attorney at law is not criminal in its nature so as to entitle a defendant to claim his constitutional privilege as a witness, and proper inferences may be drawn from his refusal to answer questions in regard to an employee who, according to the testimony of one of his clients, was an important factor in a transaction alleged as a ground for disbarment. But such inference is not sufficient corroboration of a witness whose character as an unmitigated liar was established.

DISCIPLINARY PROCEEDINGS instituted by the Association of the Bar of the City of New York.

*Austen G. Fox* of counsel [*Einar Chrystie*, attorney], for the petitioner.

*Edgar T. Brackett* of counsel [*Leonard F. Fish* and *Andrew Byrne* with him on the brief], for the respondent.

CLARKE, P. J.:

The respondent was admitted to the bar in November, 1897, and since that date has practiced and is now practicing in the First Judicial District. The petition alleges that the respondent has been guilty of misconduct, (a) that since 1906 respondent has been engaged almost exclusively in litigation growing out of claims for personal injuries or death and has made it a business to seek litigation of that kind. For that purpose he has had among his employees Jeremiah F. Sullivan, Walter F. Peck and Alexander Wuerz, who are not attorneys and one of whose duties it was to solicit claims for the respondent. Sullivan, Peck and Wuerz were promised

First Department, July, 1918.            [Vol. 184.

by and received from the respondent money in consideration of their placing or their having placed such claims in his hands for the purpose of bringing action upon them, and certain details of the methods employed were set forth.

As to this specification the learned referee reported that the respondent is entitled to a finding that charge " a " has not been sustained by sufficient evidence, and we agree with him.

Charge " b " is as follows:

In June, 1911, Charles J. Fox, a resident of New Haven, Conn., was severely injured at Fairfield, Conn., while in the employ of the New York, New Haven and Hartford Railroad Company, a Connecticut corporation. In August of that year Peck, one of the respondent's employees, went to Connecticut and met Fox, who was on his way from the Bridgeport hospital to his home, and in behalf of the respondent solicited from Fox his claim for damages for his injuries, and finally, in November, 1911, Fox retained the respondent. Prior to the signing of the retainer the respondent, as an inducement to Fox to sign it, promised to pay or to cause to be paid to him money for his support during the pendency of the action. The respondent induced Fox to leave his home in New Haven and to take a furnished room in Yonkers, Westchester county, in this State, and to assume a fictitious residence there for the purpose of permitting the respondent to bring an action in this State, and Fox did so in November, 1911, and continued this fictitious residence until May, 1912. In accordance with the agreement made before the retainer was signed, the respondent, after Fox signed the retainer, paid or caused to be paid to Fox the sum of ten dollars per week for about twenty-seven weeks, until May, 1912. In November, 1911, the respondent began an action in behalf of Fox against the railroad company in the Supreme Court, Westchester county, which action was on motion of the company thereafter removed to the United States District Court for the Southern District of New York. On May 2, 1912, the attorney for the company and the respondent agreed on a settlement of the action for $17,500, and on May 3, 1912, when the case was called by the court it was marked " settled."

It is established without controversy that Charles J. Fox

in the month of June, 1911, was a fireman in the employ of the New York, New Haven and Hartford Railroad Company. He resided at New Haven, Conn. He was injured in an accident which occurred on the 6th of June, 1911, at Fairfield, Conn. He subsequently retained the respondent as his attorney, who commenced an action in his behalf against the railroad company to recover damages in the Supreme Court of the State of New York, laying the venue in Westchester county. The case was removed upon petition of the railroad company to the United States District Court for the Southern District of New York and resulted in a settlement for the sum of $17,500.

After said settlement a controversy arose between Fox and the respondent as to the latter's compensation under his retainer, as a result of which the matter was sent to a Mr. Berry, as referee, Fox giving evidence upon such reference. Subsequently an investigation was had before the grievance committee of the Bar Association where Fox testified as did the respondent. As the result of such investigation the charges at bar were formulated and presented to this court. The matter in issue is very simple and it is namely, whether the respondent caused Fox to acquire a fictitious residence in Westchester county for the purpose of bringing suit against the railroad company in said county and as an inducement agreed to pay and did pay to Fox moneys for his support and expenses pending the determination of the suit.

The determination of those simple questions is, however, complicated by the fact that although Fox had twice testified in the two proceedings before Referee Berry and before the grievance committee, when he was put upon the stand before the learned official referee in this proceeding, he, for a long time, refused to testify upon the ground that his answers to the questions put would incriminate him, and made many statements on such initial examination which he thereafter admitted were false. He subsequently changed his attitude and testified fully against the respondent. Later, after the conclusion of the reference and the filing of the referee's first report, he verified a recanting affidavit in which he swore that such evidence against the respondent was perjurious and false. This court thereupon recommitted the matter to

the referee and a further and prolonged hearing was had. Fox was produced for examination by respondent and repudiated his prior testimony swearing positively that neither respondent nor Peck had induced him to take up a fictitious residence and that neither had promised to pay or had paid moneys to him for his support during the pendency of the action or as an inducement for the retainer and that all his repeated testimony to that effect was false. It is obvious under such circumstances that the learned official referee was entirely justified in stating that no finding could be based upon the testimony of such a self-confessed perjurer unless corroborated. Nevertheless he found that the charge had been sustained.

A careful examination of the voluminous testimony taken in this case satisfies us that there is not sufficient corroborative evidence to justify a finding of guilt. One Walter F. Peck had been employed in investigating, procurement of witnesses and statements, by the respondent, for some time. He was on a weekly salary up to the 1st of January, 1912, and then on a per diem until after the Fox case was settled. The respondent was the attorney for the engineer, one Huff, injured in the same accident with Fox, and, in the course of his investigation in regard to that accident, Peck met Fox. It was undoubtedly due to Fox's knowledge that respondent was the attorney for Huff and to his acquaintance with Peck that he finally, in November, retained the respondent. It is also true that though living in New Haven he took up a residence in Westchester county and remained there until after the settlement of his case. It is also true that respondent drafted the complaint in Fox's action himself and laid the venue in Westchester county. He testified: "I had a right to, the defendant operates in Westchester county and you have a right to sue a railroad in any county through which it runs." But at that time an action against a foreign corporation under section 1780 of the Code of Civil Procedure could not be brought in this State by a non-resident except upon the causes of action set forth in said section which did not include one for damages for negligence not occurring within the State. The respondent knew at the time he instituted the action that such a temporary sojourn as that of Fox's

did not confer jurisdiction, for he was the attorney in *Hislop* v. *Taaffe* (141 App. Div. 40), decided just one year before his retainer, where the Appellate Division in the Second Department said: " There is evidence * * * that his object [referring to the plaintiff] in going to Westchester county was to enable him to bring this action in that county, and that as soon as it was tried it was his intention to return to Belmar permanently. These statements are not denied. There is no pretense that he has any occupation in Yonkers, or is seeking any employment there. His counsel frankly admitted that his purpose in going there was to enable him to bring this action in Westchester county, and he asserts that he is within his legal rights in so doing. * * * " But the court concluded: " His sojourn in Yonkers for the purpose of attending to this business is not sufficient to deprive him of his original residence in Belmar, or make him a resident of Westchester county, within either the spirit or the letter of the Code provision."

It was not until 1913 that the section was so amended as to permit a non-resident to bring an action in this State where a foreign corporation is doing business within the State. (Laws of 1913, chap. 60.)

Respondent denied, however, that he had induced Fox to take up his residence in Yonkers. He testified that Fox was unwilling to bring an action in the State of Connecticut because of his opinion as to the attitude of the courts of that State towards negligence actions brought by employees against railroad corporations; that Fox stated he had first communicated with a lawyer in Springfield, Mass., with an idea of having an action brought there, and that he discussed with respondent going to live in Herkimer county with some relatives, or in Brooklyn with others, but concluded it would not be pleasant to live at either place with his relatives and finally went to Yonkers. It is clearly established that Peck wrote a letter for Fox, which was signed by him, and sent to the attorney in Springfield with whom he had been in communication withdrawing his case from his hands. It is also established that Peck went with Fox to Yonkers when he procured a lodging there and communicated with him several times by letter, but there is no evidence of promises

to pay or the payment of money to Fox *pendente lite* other than his own testimony, repudiated by him under oath, as absolutely false.

An inference is sought to be drawn from certain refusals of the respondent to answer questions when under cross-examination. When the petitioner rested no evidence had been given in support of the first charge in the petition, namely, a course of conduct under which respondent had promised to Sullivan, Peck and Wuerz, three of his employees who were not attorneys, moneys for their placing or having placed claims of litigants in his hands. The respondent thereupon moved to dismiss that charge, which the learned referee very properly denied upon the ground that he was without power. Under cross-examination respondent was asked certain questions which he declined to answer upon the ground that they had to do with the first charge in regard to which the petitioner had given no proof and that, therefore, they were immaterial matters which he was not called upon to meet; that he was ready to meet anything growing out of the Fox or Monahan charges. Being further pressed he claimed his constitutional privilege. We are clearly of the opinion that a proceeding of this character is not criminal in its nature. In *Matter of Randel* (158 N. Y. 216) the court said: " The defendant declined to be sworn in his own behalf at the trial. This refusal to testify raises the legal presumption of the truth of these facts, which might have been known to defendant, and which he failed to contradict. (*Wylde* v. *Northern R. R. Co.*, 53 N. Y. 156.) This is in no sense a criminal proceeding, and the statutory rule of no presumption in such cases does not apply." Further in *People* v. *Tice* (131 N. Y. 651) the court said: " The principle that an accused person who becomes a witness in his own behalf, thereby places himself in the attitude of any other witness in respect to the right of cross-examination, has been announced in many cases in this court." And in *Caminetti* v. *United States* (242 U. S. 470) the Supreme Court of the United States in a carefully considered opinion said: " When he took the witness stand in his own behalf he voluntarily relinquished his privilege of silence, and ought not to be heard to speak alone of those things deemed to

be for his interest and be silent where he or his counsel regarded it for his interest to remain so, without the fair inference which would naturally spring from his speaking only of those things which would exculpate him and refraining to speak upon matters within his knowledge which might incriminate him.  *  *  *  The court did not put upon the defendant the burden of explaining every inculpatory fact shown or claimed to be established by the prosecution.  The inference was to be drawn from the failure of the accused to meet evidence as to these matters within his own knowledge and as to events in which he was an active participant and fully able to speak when he voluntarily took the stand in his own behalf."

As to one of these instances the record shows the following: " Q. Mr. O'Neill, how long have you known Alexander Wuerz? A. The same declination. Withdrawn. I know Wuerz I should say possibly fifteen years.  Q. When was he in your employ?  Mr. Byrne: This is a matter, if your Honor please, that they have given absolutely no proof on at all. Mr. Spence: Your Honor will recall the letters of Mr. Wuerz to Mr. Fox, and Mr. Wuerz is connected up with the Fox matter from beginning to the end.  A. The same declination upon the grounds stated at length as to those other questions. The Referee: The witness should answer.  The respondent: I respectfully decline upon the grounds as stated under section 837 of the Code and the Constitution, and as more fully stated before.  Mr. Spence: Do you refuse to answer any question concerning your relations with Mr. Wuerz?  The respondent: The same declination on the same grounds. Mr. Spence: Do you refuse to answer any questions having to do with your relations with Alexander Wuerz from May, 1911 until June, 1912?  The respondent: I don't distinguish that part from any other part.  *  *  *  Except one. Mr. Spence: What is that one?  The respondent: I have no objection to testifying to the fact that I never gave him any money to give to Fox.  Mr. Spence: And that is all the questions that you will answer?  The respondent: That is all with reference to him, with reference to my relations to him.  You are not attempting here to cross examine me

as to the matters that you have given proof. You are going into outside matters."

Testimony had been given by Fox that he had been paid through Wuerz ten dollars a week while he was living in Yonkers and that he made out slips to Wuerz acknowledging payment and that in one instance he had received a letter which was admitted in evidence signed by Wuerz: " DEAR CHARLES.— Enclosed find my compliments. Best wishes to your mother and yourself," and stated that the compliments consisted of ten dollars.

We think the respondent was ill-advised when he refused to answer questions in regard to Wuerz, who, according to Fox's story, was an important factor in the transaction, and under the rule in the *Caminetti* case all proper inferences may be drawn from his refusal. But he denied absolutely that he had given any money to Wuerz to give to Fox, or that he promised to give Fox any money, directly or indirectly, or that any money had been given to him by his direction, and he also denied any knowledge of the letters written by Peck, or any authorization to him to make any promises, or give any money, and there is no evidence, outside of the testimony of Fox, of these weekly payments. And Fox subsequently testified repeatedly that his original testimony in that regard, both as to the respondent and Peck, was absolutely false, and that his story of having received two hundred and seventy dollars, namely, ten dollars a week for twenty-seven weeks, was false. He did admit the receipt of a small sum for services in looking up witnesses in the Huff case at one time, and another small sum as a loan, but swore that neither of these sums came from the respondent or were inducements for placing his case in his hands.

We are of the opinion that the legitimate inference to be drawn from respondent's refusal to answer the question as to his relations to Wuerz is not a sufficient corroboration of Fox's story of the promise and receipt of money to cause it to be accepted in the face of his subsequent repudiation and his established character as an unmitigated liar.

It is further sought to corroborate Fox's testimony against the respondent by certain writings made in the form of statements to various counsel, and to memoranda kept by

himself and of notations written by himself upon letters received from Peck, upon the ground that, after a witness has recanted his testimony, prior statements made before the litigation and when he had no reason to mis-state can be received to establish the credibility of the withdrawn or recanted story. Fox had a controversy, after the settlement of his case in the United States Circuit Court for $17,500, with the respondent as to the interpretation of the written retainer which provided: " I agree to pay the said attorney one-half of the amount of moneys recovered. For settlement without the preparation for and trial of said claim I agree to pay the said attorney one-third of said amount of moneys recovered."

After the amount of the settlement was agreed upon he signed this paper:

" NEW YORK, *May* 2, 1912.

" I hereby authorize Thomas J. O'Neill, my attorney, to settle my case vs. N. Y., N. H. & H. R. R. Co. for $17,500, out of which I am to receive Nine thousand dollars ($9,000) free and clear of all expense.        CHARLES J. FOX.

" S. FASANILLO,

" *Comm.-of-Deeds,*

"N. Y. City."

The respondent claimed that as the case was not settled till called for trial and his preparation had been made he was entitled to one-half. Fox claimed that he was only entitled to one-third as there had been no trial, and, when confronted with the authorization, claimed that the words " out of which I am to receive Nine thousand dollars ($9,000) free and clear of all expense" were not on the paper when he signed it but had been inserted thereafter by O'Neill and hence was a forgery. Having this controversy with the respondent over the amount of the recovery which he was to receive, Fox went to several people and made statements to them, and also wrote out various matters on paper, and a proceeding was instituted in the United States court where it was decided that upon the retainer the respondent was only entitled to one-third of the amount recovered, and the balance was paid over. But this claim of forgery was per-

First Department, July, 1918. [Vol. 184.

sisted in by Fox and was one of the subjects of inquiry before the grievance committee of the Bar Association when they were investigating respondent's relations to the Fox case prior to the filing of charges in suit and Fox there reiterated his claim. It was, however, thrown out by the Bar Association, was not incorporated in the charges in the present proceeding, and, upon inspection of the paper itself, it is clear that the claim of forgery is absolutely unsubstantiated. Under such circumstances with the bitter feeling that Fox then had towards his attorney, going to the extent of charging him with absolute forgery and endeavoring to get money from him and instigating proceedings against him, it cannot be said that statements so made were such as to permit them to re-establish credibility. They were not made *ante litem motam* and must be looked at in the light of self-serving declarations. So far as the annotations upon letters are concerned there is no credible evidence as to when they were made and for the same reason have no probative force.

The charge made is a grave one. If established by competent proof the disbarment of the respondent would follow as a matter of course. It should be pointed out that there is not a scintilla of evidence tending to show that the respondent had anything to do with bringing about the recantation of the witness Fox. While there are suspicious circumstances in this record we are of the opinion that the credible evidence does not sustain the conclusion of the learned official referee as to this charge.

The third charge is that upon a trial in the United States court the respondent aided Peck in testifying falsely and by such false testimony concealing from the court Peck's employment by the defendant. There is a question as to the correctness of the minutes. The matter inquired about was immaterial and we are of opinion that there is no substance in the charge.

Our conclusion upon the whole case is that the charges should be dismissed.

DOWLING, SMITH, PAGE and SHEARN, JJ., concurred.

Proceeding dismissed. Order to be settled on notice.