. as requested by the plaintiff was immaterial and the exception to such refusal gives no ground for a new trial.

"The judgment should be affirmed, with costs."

*John E. Parsons* for appellant.

*Robert H. Griffin* for respondent.

PECKHAM, J., reads for affirmance.
All concur.
Judgment affirmed.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOSEPH L. TICE, Appellant.

The court will not, under the authority conferred upon it by the act of 1887 (Chap. 493, Laws of 1887), to grant a new trial on appeal from a judgment of conviction in a capital case, interfere with a verdict supported by sufficient evidence, unless it reaches the conclusion on the whole case that there is a strong probability that injustice has been done.

Where the defendant in a criminal action avails himself of the privilege given him by the Code of Criminal Procedure (§ 393) of testifying as a witness in his own behalf, he places himself in the position of any other witness in respect to the right of cross-examination, and he may be required to answer questions affecting his credibility, or as to matters relative to the issue, although having no relation to his testimony on the direct examination.

Where, therefore, upon the trial for murder, wherein the defense of insanity was interposed, defendant testified as a witness in his own behalf, *held*, that he was properly required to answer questions relating to his life tending to test his memory, and to show that unpleasant relations existed between him and the deceased, about the time of the homicide; and also questions bearing upon facts brought out on the trial, in regard to which he had not testified on his direct examination.

(Argued March 4, 1892; decided March 15, 1892.)

APPEAL from judgment of the Court of Oyer and Terminer for Monroe county, entered upon a verdict rendered December 9, 1891, convicting the defendant of the crime of murder in the first degree and from an order denying a motion for a new trial upon the minutes.

The following is the opinion in full:

"A perusal of the case leaves no doubt that the evidence justified the verdict. The fact that the defendant caused the death of his wife is undisputed, and the elements of intention, motive, deliberation and premeditation are found in the proofs on the part of the prosecution. The defendant in the afternoon of July 11, 1891, entered the house of Mrs. Kehl, where his wife had resided for several months in the capacity of a domestic, and seated himself in the room where his wife and Mrs. Kehl were. His wife was standing at a table engaged in washing dishes. He asked his wife if she would consent to live with him, and she said: 'No; I will never trust you again, because you stabbed me once and I laid at the point of death in the hospital, and I will never trust you again.' He asked her a second time if she would not live with him and she again refused. Mrs. Kehl left the room for a moment and when she returned she testified that the defendant was standing by the table, with one hand on the shoulder of his wife and with the other making motions as if striking at her in front. His wife made an exclamation and ran out of the door into the yard. The defendant followed her and plunged a knife into her back and left it in her body. She started again to get away and the defendant overtook her and pulled the knife out of her body and returned to the steps of the house, holding the bloody knife in his hand. He remained on the steps a few moments and then crossed the yard into the street and was shortly afterwards arrested. The wife fell near the gate and soon died. The autopsy disclosed three fatal knife wounds on her person, two in front and one in the back. The intention of the defendant to kill his wife was clearly established by the circumstances immediately attending the homicide. The evidence of deliberation and premeditation disclosed by the circumstances of the assault was supplemented by other proof. It was shown that on Friday (the day before the homicide) the defendant, who worked in a shop for the manufacture of wood mouldings, was seen sharpening a knife like the one with which the wounds were inflicted. It was a knife in which the blade was firmly set in the handle, not movable, and different from any used in the shop. When he entered the Kehl house on the day of the homicide the knife

was not in his hands, and the inference is that it was concealed upon his person.

"The motive which prompted the murder was sought to be disclosed by proof of the relations existing between the defendant and the deceased. They were married in 1867, both parties having been married before, and both having had children by the former marriage. They had frequent broils after their marriage, attributable in the main, as the evidence tends to show, to their habit of drinking intoxicating liquors. The husband frequently came home drunk and the wife occasionally drank to excess also. About a year before the homicide, while they were living together at Mrs. Kehl's, the husband stabbed his wife and afterwards stabbed himself. The wife, a few months before the homicide, caused her husband to be arrested and sent to the penitentiary for drunkenness, and he was discharged from the penitentiary July 4, 1891, a few days before the homicide. The husband also on one occasion caused his wife to be arrested for drunkenness. The parties separated in the spring of 1891, and did not thereafter live together. But the husband exhibited great anxiety to have his wife live with him again, and expressed to many persons great affection for her. He frequently importuned her to consent to live with him again, and solicited Mrs. Kehl and other persons to influence her to do so. But she persistently declined. On the day before the homicide he sought to get a married daughter of the deceased to induce her mother to live with him. Later on the same day (Friday), according to the witness Mrs. Kehl, the defendant told her he heard his wife was going to Canada, and he said 'I will spoil her fun.' And on Saturday morning (the day of the homicide) he went to Mrs. Kehl's and she told him not to come again, and he went away and returned in the afternoon, when the homicide was committed.

"This brief recital of some of the circumstances shown by the evidence for the people, is sufficient to disclose an ample justification for the verdict. If the jury credited the evidence it showed a homicidal act, intentionally done, with deliberation and premeditation, prompted by a definite human motive, or incited by anger or resentment.

"The defense was insanity. The jury found against it, and

the evidence in its support was very weak. It was shown that when sober the defendant was a kind and industrious man. It appeared that he had been afflicted for some years with what the physicians called *locomotor ataxia*, which they described as a disease of the nervous system, producing extreme irritability and sleeplessness, affecting the movement of the limbs, rendering the brain more susceptible than it otherwise would have been to the influence of stimulants and impairing the memory.

"Five or six years before the homicide the defendant had attempted suicide by taking poison, on account of his domestic troubles, and again attempted to stab himself on the occasion previously mentioned. He exhibited eccentricities of conduct for some time before the homicide. Witnesses testified to seeing him early in the morning standing in sight of Mrs. Kehl's house, watching apparently for his wife and waiving his handkerchief to any female he saw coming out of the house.

"The court, in a fair charge, submitted all the facts to the jury.

"Upon reviewing them we are unable to reach the conclusion that the case calls for the exercise of the jurisdiction to grant a new trial, conferred upon this court by chapter 493 of the Laws of 1887. That authority, as we held in the case of *People* v. *Cignarale* (110 N. Y. 23), is to be exercised under the restraint of settled rules, and the court will not interfere with the verdict of a jury where it is supported by sufficient evidence, unless we reach the conclusion on the whole case that injustice has been done, or that there is a strong probability that injustice has been done in the disposition made of the case by the jury.

"The only exception which needs particular notice is that taken to questions put by the public prosecutor to the defendant on his cross-examination. The defendant was called and sworn as a witness in his own behalf, and his examination in chief was confined to questions calling for his age, nativity, place of birth, and the fact that he served as a soldier in the war of the rebellion, having enlisted twice, and that he was honorably discharged. The public prosecutor then proceeded to cross-examine him, and was permitted, under objection, to

ask a variety of questions: *First.* Questions relating to events in his life, with the dates and places, when and where they occurred, not disparaging in their character, but which served to illustrate and test the memory of the defendant; and *second*, questions bearing upon some of the facts brought out in the course of the trial. For instance, the prosecutor asked him whether he ground a knife the day before the homicide, and whether he had asked his wife several times to live with him, and whether he saw her on Friday, and to this question he replied that he did, and that 'she insulted him and used very bad language.'

"These questions had no relation to the facts brought out in defendant's examination in chief, nor did the facts elicited affect his credibility ; but they were pertinent to the issue. The questions put to test his memory bore upon the truth of the claim made in his behalf that his disease impaired his faculties, including his memory. The question as to the knife he answered in the negative. His testimony that he saw his wife on Friday and that she abused him, bore on the question of motive. It was competent for the prosecutor to show the state of feeling between the defendant and his wife, and that their relations were hostile. Any circumstances tending to explain the motive for the homicide, or from which the jury might draw the inference that the defendant was prompted by anger or resentment, were admissible.

"The objections taken to the questions put to the defendant on cross-examination are based upon the constitutional provision that no person shall be compelled in any criminal case to be a witness against himself. (Const. art. 1, § 6.) This provision was aimed at the practice which in early times prevailed in England and on the continent of Europe, of subjecting accused persons to torture in order to extort confessions of guilt, and the modified practice which prevails in some countries to subject them to judicial examination in the absence of counsel, in order to probe the conscience and induce a statement of criminating facts bearing upon the charge which is the subject of the inquiry. The constitutional provision protects persons charged with crime against such inquisitorial and compulsory proceedings.

"Under the rule of the common law an accused person was not permitted to be a witness in his own behalf. This rule has been changed in this and other states, by recent legislation. The law of this state provides that 'the defendant (in a criminal case) in all cases may testify as a witness in his own behalf, but his neglect or refusal to testify does not create any presumption against him.' (Code Crim. Pro. § 393.) The law so far as it can, protects a defendant who omits to be sworn, from having that fact weigh against him.

"In construing this recent legislation there has been much contrariety of decision in different states as to the scope of the right of cross-examination of the accused person who has become a witness under these enabling statutes. In some of the states the rule has been adopted that by becoming a witness for himself, he thereby subjects himself to the same rules of examination as any other witness and may be asked any questions on cross-examination or matters pertinent to the issue, or calculated to test his accuracy, veracity or credibility, subject to the power of the court in its discretion to limit and regulate such examination as in cases of other witnesses.

"In other states it has been held that the right of cross-examination under these statutes is confined to matters referred to in the examination in chief, and that the witness cannot be required to testify as to other facts material to the issue, or as to events in his life, for the purpose of affecting his credibility or character.

"The difference in the decisions in different states are attributable in part to a difference in the language of the statutes. Some of the statutes in terms limit the cross-examination to matters referred to in the examination in chief. In neither of the two classes of decisions is there, we apprehend, any invasion of the constitutional provision referred to. The accused is not compelled to become a witness. When he avails himself of the privilege conferred by the statute, he subjects himself voluntarily to the situation of any other witness, and if he is compelled to answer disparaging questions, or to give evidence relevant to the issue, which is injurious, it is the consequence of an election which he makes to become a witness, which involves a waiver on his part at that time, of the consti-

tutional exemption. If he accepts the privilege given by the statute, he takes it with its attendant dangers. 'His own act is the primary cause, and if that is voluntary he has no reason to complain.' (CHURCH, Ch. J., *Connors* v. *People*, 50 N. Y. 240.)

"The principle that an accused person who becomes a witness in his own behalf, thereby places himself in the attitude of any other witness in respect to the right of cross-examination, has been announced in many cases in this court. (*Brandon* v. *People*, 42 N. Y. 265; *Conners* v. *People*, *supra*; *Stover* v. *People*, 56 N. Y. 315; *People* v. *Casey*, 72 id. 394.)

"The same rule has been declared in the courts of Massachusetts, Maine, New Hampshire and other states, under statutes similar to the statute of this state. (*Com.* v. *Mullin*, 97 Mass. 545; *State* v. *Witham*, 72 Me. 531; *State* v. *Ober*, 52 N. H. 459.)

"The cases in this state were those where exception was taken to rulings permitting questions affecting the credibility or the moral character of the accused. But if the constitutional protection can be interposed at any point in the examination, we do not perceive any logical reason why it may not be invoked to protect the accused against answering questions affecting his credibility, and also to prevent an examination as to relevant facts, or indeed as to any fact, whether pertaining to his testimony in chief or not. This broad view of the scope of the constitutional exemption seems to be the one entertained by Judge COOLEY (Const. Lim. p. 317), but it is not in harmony with the decisions in this state and does not seem to us to be sound in principle. The statute permits the accused to be a witness. This must mean, a witness generally in the cause, and not that he may be a witness as to such matters only as to which he may choose to testify. This being the construction put by our courts upon the statute, there is no constitutional right infringed, if the accused having elected to take the stand as a witness, is subjected to the ordinary rules of examination.

"The range and extent of the cross-examination is within the discretion of the trial judge, provided only that it relates to relevant matters or to matters affecting credibility. The trial judge may properly restrict the cross-examination of accused

persons within narrower limits than in ordinary cases, but the latitude allowed is a matter for the trial judge.

"The questions put to the defendant to test his memory were relevant to his defense of insanity and were plainly competent. The questions tending to show the unpleasant relations between the witness and the deceased at or about the time of the homicide, were relevant on the question of inducement and motive. This was a part of the case of the people, but it is the constant practice in civil and criminal trials to permit the plaintiff or the people to fortify their own case by facts elicited on cross-examination of the witnesses for the defense. The matter is subject to the regulation and discretion of the trial judge.

"There was no error, therefore, in permitting these questions to be asked. That the answers to the questions respecting the interview between the defendant and his wife on the day preceding the homicide, in fact did him no harm, is evident since the same transaction had been brought out by the defendant's counsel on a prior examination of a witness for the defendant.

"There is no ground for interfering with the judgment and it should be affirmed."

*James G. Greene* for appellant.

*George A. Benton, District Attorney*, for respondent.

ANDREWS, J., reads for affirmance.
All concur.
Judgment affirmed. _____

In the Matter of the Judicial Settlement of the Accounts of HENRY R. GORDON, as Administrator with the Will Annexed.

(Argued March 2, 1892; decided March 22, 1892.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department, entered upon an order made May 12, 1891, which affirmed a decree of the surrogate of the county of Kings settling and allowing the accounts of the petitioner.