THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES F. KENNEDY, Appellant.

Second Department, September 4, 1979

### APPEARANCES OF COUNSEL

*John J. Meglio* for appellant.

*Eugene Gold, District Attorney (Reina Barcan* of counsel), for respondent.

### OPINION OF THE COURT

LAZER, J.

After a jury trial, the defendant was convicted of two counts of murder in the second degree and sentenced to concurrent indeterminate terms of imprisonment of from 15 years to life on each count. On this appeal, he argues that his guilt was not proven beyond a reasonable doubt and that the trial court committed reversible error when it restricted his attorney's attempt to adduce evidence pertaining to the voluntariness of defendant's confession. We conclude that the defendant was deprived of due process when his right to cross-examination on the issue of the voluntariness of his confession was limited by the court.

The defendant was indicted for felony murder and common-law murder as a result of the slaying of Richard Berkley, Sr., on August 19, 1975, allegedly during an attempted robbery by the defendant and an accomplice. At the conclusion of a *Huntley* hearing, the trial court ruled that defendant's inculpatory statement to law enforcement officials was not obtained in violation of his constitutional rights.

According to the testimony elicited by the People in the course of the *Huntley* hearing and at the murder trial, on September 1, 1975, at approximately 9:30 A.M., the defendant voluntarily went to the 69th Precinct station house for questioning regarding the Berkley killing. After he was advised of his *Miranda* rights by Detective Walter Zimmy, the defendant agreed to answer questions without an attorney present and told Zimmy that early on the day of the murder he had gone to Berkley's real estate office with his friend, Bobby, to see if he could get an apartment and that when he left Berkley's office at about noon the latter was still alive. This exculpatory account was repeated by the defendant to an Assistant District Attorney, Robert Bridges, at which time it was steno-

graphically recorded. After giving his statement to Bridges, the defendant consented to Zimmy's request that he submit to a polygraph examination at the police academy. En route to the academy, Zimmy and the defendant stopped at a hamburger establishment for something to eat but, after arriving at the academy at about 2:00 P.M., and just before submitting to the polygraph examination, the defendant asked to speak to Zimmy again, and after being read his *Miranda* rights once more, he confessed. In the confession, the defendant stated that on the day of the murder he had accompanied Bobby to Berkley's office, Bobby pointed the gun at Berkley and demanded that he give them the money from his safe, but when Berkley refused, Bobby shot him. After leaving Berkley's office, defendant and Bobby removed the four spent cartridges from Bobby's .38 calibre revolver, and the defendant threw them into a vacant lot.

It is apparent from this testimony that the defendant was in Zimmy's custody all day on September 1, 1975, although he was not formally arrested by the latter until about 7:30 P.M. after they returned to the station house from the academy. At approximately 9:30 P.M. the defendant repeated to Assistant District Attorney Bridges the same inculpatory confession he had made earlier to Zimmy. This second confession was stenographically recorded by Jack Rando, a legal stenographer employed by the Kings County District Attorney's office. The transcripts of the two statements made by defendant to Assistant District Attorney Bridges on September 1, 1975 were read to the jury at the trial.

The defendant's version of these events was adduced at the trial and it differs substantially from that offered by the People. He testified that on September 1, 1975, after receiving a telephone call from the police requesting that he come in for questioning, he had gone to the 69th Precinct. Although his first statement to Bridges was true, his second statement to him was involuntarily made and induced by threats made by Zimmy en route from the 69th Precinct to the police academy to take the polygraph examination. During the entire period during which he was in police custody on September 1, 1975, he was not offered food, drink or the opportunity to telephone anyone in his family and by 9:30 P.M., when he "confessed" to Bridges, he was very tired and frightened. The defendant did not deny making the confession, however, nor that he was given *Miranda* warnings. His claim was that the confession

had been coerced from him by lack of rest and nourishment, a lengthy detention, and threats by the police, and thus he tendered to the jury the issue of the voluntariness of his confession.

It was during the cross-examination of the People's witness, Rando, by defendant's counsel, that the court intervened and limited the area of questioning. Rando testified on behalf of the People that it was he who recorded and later transcribed defendant's inculpatory statement. On cross-examination he stated that he could not identify the man whose statement he had recorded on September 1, 1975, and that while it could have been the defendant, he did not recognize him as the man whose statement he had recorded. He had no recollection of whether defendant was offered any food or drink while he was there, nor could he recall the physical condition of the man who was answering the questions. When counsel for defendant attempted to pursue Rando further concerning the circumstances surrounding the confession, what took place is reflected in the following extract from the trial transcript:

"Q [To Mr. Rando] Do you recall if this man [defendant] had a lawyer there?

"A No one else was present in the room.

"THE COURT: Would both of you come up?

(Side bar discussion between court and counsel.)

"THE COURT: Mr. Becker [defense counsel], we are here on cross-examining what happened here. Whether there was a lawyer present or not has nothing to do with the case. That is a question of law for the Court to determine, whether his constitutional rights were violated. I suggest you don't do that again in course of the questioning. I have already ruled on the question with regard to whether or not this was voluntarily made and whether or not his rights have been violated.

"It is not the jury that has to determine that, it is the Court. I have already determined it and ruled on it. If I am wrong, the Appellate Division will not hesitate to reverse me. I suggest you don't do that again. I told you if you want to go into certain things with regard to how he answered the question—

"MR. BECKER: That's what I was attempting to do.

"THE COURT: You don't go into whether or not he had a lawyer present, whether or not he was beaten or anything like that, because he wasn't. And the question comes up as to what

he looked like physically. I have already ruled that this was a voluntary confession. I have already ruled on that. Now, I suggest to you that you don't do that.

"MR. BECKER: Judge, we had a discussion about this off the record before, and it was my impression that I could ask some questions with respect to the manner in which this defendant answered these questions and also as to whether or not he had any food or drink.

"THE COURT: The manner in which he asked the question, I didn't sustain the objection. The appearance of the defendant has nothing to do with whether or not this was voluntary, it has nothing to do with whether or not he gave the statement, you understand? The jury does not determine whether or not this statement was given voluntarily or not. It's the Court that does that. It's a question of law."

■ Since it is beyond peradventure that subsequent to a *Huntley* hearing finding that a confession is voluntary beyond a reasonable doubt a defendant still has the opportunity to raise the issue of the voluntariness of that confession before the jury *(People v Huntley,* 15 NY2d 72; see *People v Cefaro,* 23 NY2d 283; CPL 710.70), the issue is whether the court's intervention deprived the defendant of his constitutional rights.

■ The word "voluntary" imports a condition of mind which is free and unconstrained *(People v Pignataro,* 263 NY 229). Defendant claimed that he had been in custody from 9:00 A.M. on September 1, 1975 until the confession was extracted from him at approximately 9:30 P.M. and that during this period he was tired, had little, if anything, to eat, and that he had no contact with family or anyone else other than the police and law enforcement officials all day until he confessed. He also asserted that Zimmy had threatened him with reprisals if he did not confess to the crime. Whether the confession was voluntary in the sense that defendant was uncontrolled by fear and his mind free to act, or whether it was involuntary in that he was coerced by fear of the consequences of a denial, was a matter for the jury which should have had the benefit of considering the "totality of circumstances" surrounding the confession (see *People v Burwell,* 25 AD2d 663; *People v Black,* 25 AD2d 663).

■ The test of involuntariness is not easily articulated. A series of circumstances may each alone be insufficient to cause a confession to be deemed involuntary, but yet in combination

they may have that qualitative or quantitative effect *(People v Anderson,* 42 NY2d 35, 38). Thus, apart from a situation where the use of physical brutality may make it obvious that a confession has been coerced, the voluntariness of a confession may best be determined through an examination of the totality of the circumstances surrounding the confession *(Clewis v Texas,* 386 US 707, 708; *People v Anderson, supra).* In *People v Alex* (260 NY 425), for example, during a preliminary examination to determine the voluntariness of his confession, the defendant sought to establish that his confession had been extorted by brutal police tactics and that he had complained of these tactics at his earliest opportunity. The court, however, sustained objections to the defendant's testimony on the latter issue and precluded him from calling two witnesses with reference to it. The confession then was received in evidence. Because defendant's conviction rested almost entirely upon his confession and because the evidence sought to be adduced by the testimony of the defendant and the two other witnesses regarding the circumstances surrounding the confession was competent and relevant to the issue of voluntariness, the Court of Appeals found that reversible error had been committed.

■■ The instant defendant's attorney was told directly that he could not cross-examine on the issue of defendant's appearance on the night of September 1, 1975, or as to whether he was beaten and who was present when the confession was recorded. Whether the cross-examination ultimately would have been probative on these issues is speculative, of course, but it is well settled that in a criminal case a party may prove through cross-examination any relevant proposition, regardless of the scope of the direct examination *(People v Fowler,* 46 AD2d 838, affd 37 NY2d 100; *People v Tice,* 131 NY 651). By repeatedly declaring to defendant's counsel in strong terms that the voluntariness of the confession could not be the subject of questioning, the trial court effectively silenced him. By depriving the defendant of meaningful cross-examination on the issue of voluntariness—a matter which was crucial to a determination of his guilt or innocence—the court deprived the defendant of a fair trial (see *Davis v Alaska,* 415 US 308; *People v Ramistella,* 306 NY 379; *People v Moore,* 96 App Div 56, affd 181 NY 524; *People v Levy,* 47 AD2d 12, mot for lv to app dsmd 36 NY2d 646). On this record, it cannot be said that the error was harmless beyond a reasonable doubt (see *People v Crimmins,* 36 NY2d 230, 237).

The judgment should be reversed and the matter remanded for a new trial.

HOPKINS, J. P., COHALAN and MARTUSCELLO, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered September 7, 1976, reversed, on the law, and new trial ordered.