THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v HORATIO BRIDGET, Respondent.

Second Department, March 17, 1980

### APPEARANCES OF COUNSEL

*Denis Dillon, District Attorney (Judith K. Rubinstein* and *William C. Donnino* of counsel), for appellant.

*Burton C. Agata* for respondent.

### OPINION OF THE COURT

COHALAN, J.

Defendant was convicted, upon a jury verdict, of the crime of murder (common law) in the second degree, in the County Court, Nassau County (THORP, J.) and sentence was imposed. He moved, pursuant to CPL 440.10 (subd 1, par [g]), to set aside the judgment on the ground of newly discovered evi-

dence. On June 21, 1978 the County Court vacated the judgment of conviction on that ground. The People have appealed.

We reverse on both the law and the facts, deny the motion, and reinstate the judgment of conviction.

Defendant was convicted of the shooting murder of Louis Randolph. The murder occurred at about 2 o'clock in the morning on March 23, 1975, a Sunday.

Willie Mae Cook, the sole nonparticipant eyewitness to the crime, lived in a one-family residence on the north side of Park Avenue in Westbury. She was in her early forties and did not wear eyeglasses. During the week she was a government postal employee. On Sundays, she had a part-time job delivering newspapers.

On this Sunday morning, she planned to arise at 2:00 A.M. and set her alarm clock accordingly. Just before the alarm went off, she heard a noise. "It sounded like maybe a fire cracker but when I got up and looked I saw what it was." She turned off the alarm and walked to her front door, a matter of only a few steps. The interior of her house was in complete darkness.

An automobile was parked right outside her house, on the north side of the street, facing west. Illumination was provided by a mercury vapor overhead streetlight. The car was parked under the light. Ms. Cook viewed the killing from about 80 feet away.

She recognized Bridget from having seen him in the neighborhood on several occasions. She was at first reluctant to admit to the police that she had recognized him, for fear of reprisal, but finally did admit it and testified against the defendant at the trial.

She testified, in part: "I saw an individual standing alongside of a car firing a gun."

She then pointed out defendant in the courtroom. She also said of the defendant: "Well, he was underneath a street light and along beside this car which had an interior light overhead."

The Assistant District Attorney asked:

"Q What did you see Mr. Bridget do at this particular time when you observed him?

"A I saw him fire this gun.

"Q How many times?

"A Three times.

"Q Miss Cook, from the vantage point where you were at your doorway, could you see to the left up to Sherman Street?

"A Yes."

And further:

"Q How long did you have Mr. Bridget under your observation at that time?

"A A few minutes. * * *

"Q What actually did you see Mr. Bridget do?

"A I saw him fire this gun three times and turn and he ran very quickly east on Park Avenue.

"Q Did anyone ever run west up to Sheridan Street?

"A No."

A few minutes later, after she had dressed, she went out and saw Randolph lying dead in the street. She notified the police immediately.

In the course of the police investigation, the defendant, in a signed statement dated April 21, 1975, admitted to the police that he was present at the scene during the murder. In his statement, however, he claimed one Larry King was the killer. No such person was ever found.

Bridget was convicted on December 22, 1977. When he appeared for sentence on January 26, 1978, he claimed that Alfred Johnson, a fellow inmate at the Nassau County Jail, was the real murderer. Defendant said he knew Johnson committed the crime "[w]hen it first happened" but that the latter admitted his involvement only after defendant was found guilty.

In *People v Salemi* (309 NY 208, 215-216), the Court of Appeals enumerated the criteria necessary for the granting of an application for a new trial on the basis of newly discovered evidence. They are six in number. " 'Newly-discovered evidence in order to be sufficient must fulfill all the following requirements: 1. It must be such as will probably change the result if a new trial is granted; 2. It must have been discovered since the trial; 3. It must be such as could have not been discovered before the trial by the exercise of due diligence; 4. It must be material to the issue; 5. It must not be cumulative to the former issue; and, 6. It must not be merely impeaching or contradicting the former evidence.' " (See, also, *People v Wagner,* 51 AD2d 186.)

In 1970, effective September 1, 1971, the Legislature enacted the new CPL (L 1970, ch 996). Included therein was CPL 440.10—entitled "Motion to vacate judgment". Subdivision 1 reads, in part:

"At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that: * * *

"(g) New evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such new evidence".

Based upon the criteria of the *Salemi* case *(supra),* and the requirements of the statute, it is the position of the People that the testimony adduced in support of the application was incredible as a matter both of law and fact, and thus could not produce a more favorable verdict if defendant was retried. In any case, the People add, it was not asserted with due diligence. The defendant, of course, maintains to the contrary.

At the hearing on Bridget's application to set aside the judgment, it was incumbent upon him to "prov[e] by a preponderance of the evidence every fact essential to support the motion." (See CPL 440.30, subd 6.)

Bridget called Alfred Johnson, who testified that he came upon the deceased, Louis Randolph, for whom he allegedly harbored resentment because of some recent unpleasantness between them. Randolph was in the company of the defendant. Johnson shot at defendant, but missed. He then fired three shots at Randolph, killing him. The slayer thereupon left the scene by going west to Brush Hollow Road. Johnson claimed he knew defendant from the "street". Defendant knew Johnson in the same way.

When asked by the defense attorney why he was trying to exculpate Bridget and to take the blame for the Randolph killing, Johnson's response was:

"All I want to do is just tell the truth. And [if] telling the truth get me hung, I want to die telling the truth.

"It don't make sense for me to tell a lie when I know it's a lie. And I would not try to take the rap off nobody.

"My brother right here, they know how to kill a guy. He got a life sentence. I wouldn't try to get it off of him. I wouldn't try to get it off that man there. I did it. It was my intention to tell it."

Shortly after voicing these lofty sentiments, and on cross-examination, the prosecutor elicited Johnson's criminal conviction record. By the age of 43, with more than half of his adult lifetime spent in jail, he had acquired convictions and sentences for grand larceny, three or four felonious assaults, robbery and an attempted murder. In January of 1978 he was in jail on an assault charge. His memory of the details of the killing incident and the geography of the scene was something less than convincing and at great variance with the testimony given by Willie Mae Cook and the statement of the defendant himself.

As one example, Johnson said that he came upon Randolph's car from the rear—the east. But at the trial, Walford, the homicide squad detective, testified that he had been told by defendant that the man he called "Larry King" had approached from the west. Then Johnson said that after he shot at Bridget, he, Bridget, fled to the west. Both Ms. Cook and Bridget himself said he fled to the east, in which event he would have had to run right by Johnson.

Johnson did not know the color of his victim's car, although it was bathed in a bright illumination. Nor did he know if Randolph sported a beard at the time. But he claimed that after shooting at Bridget once and at the deceased three times, two with telling effect, he left the scene by going west on Park Avenue to Brush Hollow Road, again at variance with the testimony of the others then concededly present.

Bridget, testifying in his own behalf at the hearing, said that he never knew that Johnson was the killer until the latter confessed. When asked to explain his statement on January 26, 1978 that he knew Johnson committed the murder "[when] it first happened", defendant replied that the District Attorney was interpreting his statement incorrectly and reiterated that he never knew Johnson did the shooting until Johnson confessed.

Over vehement objection, the court would not permit the District Attorney to examine defendant as to whether he saw

Johnson on the night of the murder. This was pursuant to its determination that any questions posed to defendant about the events on the day of the crime would violate his privilege against self incrimination.

At this point, Bridget had set himself upon the horns of a dilemma. On two occasions, first in a signed statement to the police on April 21, 1975 and second at the subject hearing, he had placed himself at the scene of the crime at the time of the crime.

If he was there, then he must have seen what happened. First he said it was Larry King who committed the murder; and whether King is factual or supposititious we do not know to this day. Now, according to Johnson, it was Johnson.

Now if Johnson was there, then Bridget must have seen enough of him to know he was not Larry King—if there is a Larry King. And if he saw Johnson, then he certainly was not duly diligent in keeping that fact quiet from March 23, 1975 until on or about January 26, 1978, when defendant's attorney said that a jail inmate (Alfred Johnson) was ready to testify that he and not Bridget had committed the crime.

Although the jury did not have the benefit of Johnson's testimony, we fail to see how his testimony, if given at a new trial, would change the result. His story is incredible and unworthy of belief. Moreover, if a new trial is held, there can be no assurance that, if called, he would take the stand in Bridget's defense.

A moment's reflection will show, too, that Johnson had nothing to lose by coming forward with his seemingly noble gesture. As a practical matter, the District Attorney cannot dignify Johnson's testimony by taking any affirmative action against him. The People have already proved the case against Bridget before a jury beyond a reasonable doubt on eyewitness testimony. For the District Attorney to go before a Grand Jury at this juncture to seek an indictment against Johnson would lend verisimilitude to Johnson's testimony that Bridget had nothing to do with the shooting of Randolph.

We go further, however, to show that Johnson and Bridget have been trying to hoodwink the court.

After the defendant rested, the People called Samuel Walls, an inmate of the Nassau County Jail, who testified to over-hearing defendant boast that he paid Johnson $5,000 to take the blame for this crime; and "they was *[sic]* going to make

the District Attorney * * * look like an ass." Beyond noting Walls' appearance and testimony, the court made no further comment about him in its decision.

In our opinion, the court improperly precluded cross-examination of defendant as to whether he saw Johnson on the night of the crime, which was definitely pertinent to the issue of whether he exercised due diligence to discover the alleged new evidence (see *People v Tice*, 131 NY 651, 654; *People v Kennedy*, 70 AD2d 181).

On this point, it is interesting to read the remark of the Trial Judge. He said: "It appears patent to this Court that a confession by a third party to a crime, if unimpeached, as in this case, and if found to be credible, would certainly change the result of a trial. At a minimum, a credible confession by a third party would certainly be likely to raise a reasonable doubt as to a defendant's guilt."

Yet it was he who would not permit cross-examination of the defendant as to whether he saw Johnson on the night of the crime, a question certainly bearing on due diligence, credibility and impeachment.

Johnson's own testimony placed defendant at the scene, in a position to know of Johnson's purported involvement from the beginning. More significantly, defendant acknowledged prior to the hearing that he knew of Johnson's involvement "[w]hen it first happened". Despite Johnson's close proximity to defendant in the Nassau County Jail from May, 1977 until after the jury verdict, defendant apparently made no effort to investigate Johnson's purported involvement.

Further, as the court indicated, the circumstances that Johnson and Bridget, inmates in adjoining cells, could prove to be murderer and accused murderer does "strain credulity to the utmost"; and, as we view it, to the point that it is improbable that Johnson's testimony would change the result.

The Judge's incredulity can be measured from the questions he addressed to the defendant when he appeared for sentencing on January 26, 1978:

"THE COURT: Are you telling me that Alfred Johnson had a conversation with you in which he said that he could—that he is the one that committed this crime and that he—

"THE DEFENDANT: I know he committed the crime.

"THE COURT: You knew he committed the crime?

"THE DEFENDANT: Yes.

"THE COURT: When did you know that?

"THE DEFENDANT: When it first happened."

At the "newly discovered evidence" hearing, the District Attorney confronted Bridget with this colloquy and asked:

"Q Did you give those answers to the questions?

"A Well, see—

"Q Did you give those answers to the questions?

"A I'm not sure but it's the wrong interpretation of what it said.

"Q Did you give the answers to the questions?

"A I'm not sure."

Shortly after this series of questions, and while Bridget was still under cross-examination, he was asked:

"Q Do you remember when for the first time, or, I should say, do you remember when was the first time that you had seen Mr. Johnson prior to the time that Louis Randolph was shot?

"A I don't know. I can't speak on that.

"Q And you had seen him on the night that Louis Randolph was shot?

"MR. SALE [defense counsel]: Objection.

"THE COURT: Objection sustained. * * *

"MR. PECK [Assistant District Attorney]: All I'm going into, Judge, is identity, that's all.

"THE COURT: Objection sustained."

In *People v Tice* (131 NY 651, *supra*), the defendant was tried for the murder of his wife. The defense was insanity. As written in the court's decision affirming the judgment of conviction (p 654): "The defendant was called and sworn as a witness in his own behalf, and his examination in chief was confined to questions calling for his age, nativity, place of birth, and the fact that he served as a soldier in the war of the rebellion, having enlisted twice, and that he was honorably discharged."

When the prosecutor, on cross-examination, sought to delve into matters not brought out on direct, objection was raised. In ruling that he was obligated to answer the questions propounded, the court said, in part (pp 656-657): "The accused is not compelled to become a witness. When he avails himself of the privilege conferred by the statute, he subjects himself voluntarily to the situation of any other witness, and if he is

compelled to answer disparaging questions, or to give evidence relevant to the issue, which is injurious, it is the consequence of an election which he makes to become a witness, which involves a waiver on his part at that time, of the constitutional exemption. If he accepts the privilege given by the statute, he takes it with its attendant dangers."

The *Tice* case has been followed in New York ever since (see *People v Shapiro,* 308 NY 453; *People v Ocasio,* 47 NY2d 55; *People v Kennedy,* 70 AD2d 181, *supra).*

In the instant case the jury, at the trial of the indictment charging Bridget with the crime of murder, had before it the testimony of Willie Mae Cook and the statements given by defendant to the police wherein Larry King is mentioned as a third person on the scene. They elected to believe Ms. Cook, who appeared as a disinterested witness. They accepted her testimony that there were only two persons at the murder scene, the slayer and the slain.

The story concocted by Johnson and Bridget transcends belief and even if we were inclined to give credence to Johnson's testimony, the fact that his testimony, if believed, was available to defendant on the very night of the murder shows a definite lack of due diligence in bringing the issue to the attention of the police authorities.

We hold that the defendant has not borne his burden. Accordingly, we reverse, deny the motion and reinstate the judgment of conviction.

LAZER, J. P., GIBBONS and GULOTTA, JJ., concur.

Order of the County Court, Nassau County, dated June 21, 1978, reversed, on the law and the facts, motion denied, and judgment of conviction reinstated. This case is remitted to the County Court, Nassau County, for further proceedings so that execution of the judgment may be commenced or resumed.