▰ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JIN CHENG LIN, Appellant. [963 NYS2d 131]—

Appeal by the defendant from a judgment of the Supreme Court, Queens County (Lasak, J.), rendered July 14, 2008, convicting him of murder in the first degree (six counts), murder in the second degree (six counts), burglary in the first degree, and attempted robbery in the first degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing (Eng, J.), of that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials.

Ordered that the judgment is modified, on the law, by vacating the convictions of murder in the second degree, vacating the sentences imposed thereon, and dismissing those counts of the indictment; as so modified, the judgment is affirmed.

The hearing court properly denied that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials. Approximately 28 hours elapsed between the time the police arrested the defendant and the time the defendant made the statement sought to be suppressed. While an undue delay in arraignment is properly considered when assessing the voluntariness of a defendant's confession, a delay in arraignment alone does not warrant suppression, as it is but one factor in assessing the voluntariness of a confession (*see People v Ramos*, 99 NY2d 27, 35 [2002]; *People v DeCam-*

*poamor*, 91 AD3d 669, 671 [2012]; *People v Williams*, 53 AD3d 591, 592 [2008]; *see also People v Williams*, 297 AD2d 325 [2002]). The record does not support the defendant's claim that the police unnecessarily delayed his arraignment. Here, the delay in arraigning the defendant was attributable to the time it took the police to conduct a thorough investigation and not to a strategically designed plan to permit the defendant to be questioned outside the presence of counsel (*see People v Williams*, 297 AD2d 325 [2002]; *People v Irons*, 285 AD2d 383 [2001]).

Moreover, the record supports the hearing court's finding that the defendant understood the import of the *Miranda* warnings (*see Miranda v Arizona*, 384 US 436 [1966]) given to him (*see People v Madrid*, 52 AD3d 530, 531 [2008]; *People v Zadorozhnyi*, 267 AD2d 263, 264 [1999]; *People v Alexandre*, 215 AD2d 488 [1995]). Further, the defendant was provided with food, water, cigarettes, access to a bathroom, and the opportunity to rest in between questioning sessions. Nothing in the record suggests that physical force was used or threatened (*see People v Mateo*, 2 NY3d 383 [2004], *cert denied* 542 US 946 [2004]; *People v Petronio*, 34 AD3d 602 [2006]; *People v Miles*, 276 AD2d 566 [2000]; *cf. People v Anderson*, 42 NY2d 35 [1977]). Accordingly, our "review of the totality of the circumstances demonstrates that the defendant's statement[s] w[ere] voluntarily made" (*People v Winkfield*, 90 AD3d 959, 960 [2011]; *see People v Seabrooks*, 82 AD3d 1130, 1130-1131 [2011]).

Contrary to the defendant's contention, and our dissenting colleague's position, the trial court did not improvidently exercise its discretion in precluding the defendant from introducing into evidence at trial a videotape of an interview conducted by an Assistant District Attorney from the Queens County District Attorney's Office on May 16, 2005. Trial courts are accorded wide discretion in making evidentiary rulings. However, "[a] court's discretion in evidentiary rulings is circumscribed by the rules of evidence and the defendant's constitutional right to present a defense" (*People v Carroll*, 95 NY2d 375, 385 [2000]). Nonetheless, the "right to present a defense does not give criminal defendants carte blanche to circumvent the rules of evidence" (*People v Hayes*, 17 NY3d 46, 53 [2011], *cert deni*ed 565 US —, 132 S Ct 844 [2011] [internal quotation marks omitted]). Indeed, a trial court has the discretion to exclude even relevant evidence if its probative value is outweighed by risks such as "undue prejudice to the opposing party, confusing the issues or misleading the jury" (*People v Aziziandavidi*, 100 AD3d 765 [2012] [internal quotation marks

omitted]). Evidence of " 'slight, remote or conjectural significance' will ordinarily be insufficiently probative to outweigh these countervailing risks" (*People v Primo*, 96 NY2d 351, 355 [2001], quoting *People v Feldman*, 299 NY 153, 169-170 [1949]). In the instant matter, we agree with the trial court's determination, in effect, that the videotape's probative value was outweighed by potential prejudice to the People. Although the defendant claimed that the purpose of admitting the videotape was to demonstrate his appearance and demeanor following multiple days of interrogation, his physical appearance on the videotape did not have any relevance to a material issue. It did not show that the defendant was subjected to any coerciveness on the part of the police. Moreover, the trial court's offer to have the jury view a still photograph culled from the videotape permitted the defendant a meaningful method by which to present to the jury his physical appearance on May 16, 2005.

However, under the circumstances of this case, as the People correctly concede, the convictions of murder in the second degree, and the sentences imposed thereon, must be vacated, and those counts of the indictment dismissed, because those charges are inclusory concurrent counts of the convictions of murder in the first degree (*see People v Howard*, 92 AD3d 1219, 1220 [2012]; *People v Villafane*, 48 AD3d 712, 713 [2008]).

The defendant's remaining contentions are without merit. Rivera, J.P., Dickerson, and Cohen, JJ., concur.

Hall, J., dissents, and votes to reverse the judgment, grant that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials, and order a new trial, with the following memorandum: I must respectfully dissent because, in my view, the statements made by the defendant to law enforcement officials should have been suppressed, and the defendant was deprived of his constitutional rights to present a defense and to a fair trial.

This case involves the murders of Cho Man Ng, known as Sharon (hereinafter Sharon), and her brother, Sek Man Ng, known as Simon (hereinafter Simon), which occurred on May 12, 2005, in Queens County. According to the evidence presented at the suppression hearing, at approximately 7:00 a.m. or 8:00 a.m. on May 13, 2005, Detective Bernard Marshall and another detective went to the home of the defendant and asked him to accompany them to the precinct station house to discuss the murders. The defendant willingly went with the detectives to the station house.

At approximately 11:00 a.m. on May 13, 2005, Detective Philip Wong spoke to the defendant, who was sitting in a "12 by 12"

interview room with no window. Detective Wong spoke to the defendant in English and in the Cantonese dialect of the Chinese language. Detective Wong interviewed the defendant six or seven times throughout the course of the day; no interview lasted longer than 10 to 15 minutes.

The defendant told Detective Wong that he had known Sharon for approximately seven years, and had dated her for approximately five years. According to the defendant, he broke up with Sharon approximately one year earlier because she was cheating on him with a married man. The defendant stated that on May 12, 2005, he went to Sharon and Simon's home, and after Simon answered the door and let him in, the defendant gave Simon a gift to give to Sharon. The gift consisted of two seashell figurines.

At 10:00 p.m. on May 13, 2005, Detective Kevin Hui entered the interview room, where the defendant was speaking with Detective Wong and two other detectives. After five minutes, the defendant asked to speak to Detective Hui alone. Detective Hui spoke to the defendant in the Cantonese dialect. At the beginning of the conversation, Detective Hui instructed the defendant not to waste his time, and that if the defendant "wanted to talk, talk." The defendant asked Detective Hui what would happen if he "st[u]ck it out to the end," or if he talked. The defendant also asked Detective Hui if they could work out a deal. Detective Hui replied that he was not the case officer, but that he would get someone to talk to the defendant. As Detective Hui walked out of the interview room, the defendant stated that "he didn't want to squat for 60 years until he's 60 . . . maybe until 40." Detective Hui then informed the detectives and a Lieutenant Belluchi of his conversation with the defendant. However, Lieutenant Belluchi ultimately decided to let the defendant go home.

The very next day, on May 14, 2005, at approximately 11:00 a.m., Detective Marshall picked up the defendant, who willingly returned to the station house. At approximately 11:40 a.m., Detective Marshall, speaking in English, advised the defendant of his *Miranda* rights (*see Miranda v Arizona*, 384 US 436 [1966]) by reading them to him from a form. The defendant wrote "yes" after all the questions on the form and signed the form. The defendant then stated, among other things, that he had wanted to give Sharon the figurines before he left Sharon and Simon's apartment.

After Detective Marshall spoke with the defendant for about an hour and a half, the detectives spoke to other witnesses about when Sharon received the figurines. One witness stated that

the figurines were in Sharon and Simon's apartment for several weeks before May 12, 2005.

Consequently, at about 5:00 p.m. on May 14, 2005, Detective Marshall told the defendant that he had spoken to witnesses who said that the figurines were in Sharon and Simon's apartment prior to May 12, 2005. Detective Marshall spent approximately one hour with the defendant, and then left the interview room. At approximately 7:00 p.m., Detective Marshall reentered the interview room, and the defendant gave a statement, which was reduced to writing. The defendant stated, in sum and substance, that he had lived in the United States for nine years, went to Cardozo High School, and left school in the 11th grade. When he came back from China, he started working at a Chinese restaurant named "Dot Ming" in Connecticut. While working at Dot Ming, the defendant met a man named Gong. The defendant explained, in essence, that he helped Gong gain entry into Sharon and Simon's apartment so that Gong could rob them.

Specifically, the defendant stated that, at about 4:00 p.m. on May 12, 2005, he went to Sharon and Simon's apartment; Simon answered the door and let the defendant inside. The defendant talked to Simon and stayed for about a half hour. As the defendant left, he walked past a Fukienese man, who was standing next to the front door of the building and talking on a cellular phone. The defendant watched the Fukienese man walk into the building. The defendant went home and waited for Gong to call him, but Gong never called.

At approximately 9:30 p.m. on May 14, 2005, Detective Marshall informed the defendant that he was under arrest. Detective Marshall then began to investigate Gong and the Fukienese man. On May 15, 2005, from about 1:00 a.m. to 2:30 a.m., Detective John Warner spoke to the defendant and tried to obtain more information about Gong.

At about 4:30 a.m. or 5:00 a.m., Detective Marshall was at his desk, trying to get some rest, when the defendant knocked on the door of the interview room. The defendant stated to Detective Marshall, among other things, that he did not know that Sharon and Simon would be killed and that he was very scared when he heard that Sharon and Simon were dead, which was why he had originally lied. That statement was reduced to writing and signed by the defendant and Detective Marshall.

From approximately 11:00 a.m. to 2:00 p.m. on May 15, 2005, Detective Marshall and Detective William Schmittgall interviewed the defendant. The defendant was advised of his *Miranda* rights and subsequently stated, "I would like to speak

and explain things." The defendant proceeded to give the detectives information about Gong and the Fukienese man.

After the interview, Detective Marshall and Detective Schmittgall visited the home of Sharon and Simon. When they returned, they were informed that Simon made an entry in his online diary on May 12, 2005, indicating that the defendant came to his and Sharon's apartment at about 3:00 p.m. asking for fishing poles.

At approximately 9:00 p.m. on May 15, 2005, Detective Marshall and Detective Schmittgall went into the interview room and told the defendant that they had just been to the hospital and had spoken to Simon, who was getting out of surgery. The detectives falsely told the defendant that Simon was alive. The detectives stated that Simon told them that the defendant came to his and Sharon's home looking for something specific. Detective Schmittgall then wrote the words "fishing poles" on a piece of paper, turned it upside down, and placed it on the desk in front of the defendant. The detectives told the defendant to turn the paper over. When the defendant did so, his face became flushed. Detective Schmittgall stated to the defendant, "We know what is going on here," and the defendant replied, "Then you know what happened."

After sobbing for 15 to 20 minutes, the defendant stated, in sum and substance, that while inside Sharon and Simon's apartment, he had taken a knife from the kitchen, gone to Simon's room, held the knife to Simon's neck, and then had Simon tie himself up with duct tape. When Sharon arrived, the defendant, who had turned off the lights, got behind Sharon and put a knife to her neck. At that point, Simon started "going crazy" and began to break free. The defendant stabbed Simon, went back to Sharon, and stabbed her as well.

On May 16, 2005, an Assistant District Attorney (hereinafter ADA) from the Queens County District Attorney's Office came to the station house and attempted to obtain a videotaped statement from the defendant. However, in that videotaped interview, once the defendant understood that he had a right to speak with a lawyer before speaking to the ADA, the defendant asked for a lawyer and the interview ended.

After the suppression hearing, the hearing court denied that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials. The court, inter alia, found that the defendant had validly waived his *Miranda* rights, and that the defendant's deficiencies in the English language did not render his statements inadmissible. The court also found that the lengthy period of questioning and the

delay in the defendant's arraignment did not warrant suppression of the statements.

At the beginning of the trial, defense counsel informed the trial court that he wished to introduce the videotape of the May 16, 2005, interview into evidence. Defense counsel sought to introduce the videotape as evidence relating to the voluntariness of the defendant's statements. The prosecutor objected to the introduction of the videotape into evidence, maintaining that defense counsel was seeking to use the videotape to argue that the defendant did not understand English sufficiently to comprehend the *Miranda* warnings. The prosecutor asked that, if the defendant was permitted to use the videotape to make such an argument, then the People be permitted to introduce, as rebuttal evidence, the testimony of a detective who administered *Miranda* warnings to the defendant in connection with a 1998 arrest. The prosecutor also asked to present, as rebuttal witnesses, a corrections officer who completed the defendant's initial screening, and a representative of the New York City Criminal Justice Agency who interviewed the defendant in English prior to his arraignment in this case.

In addition, the prosecutor offered to stipulate that the defendant asked for a lawyer on the videotape. However, defense counsel was not satisfied with the proposed stipulation because he wanted to show the jury the defendant's physical and emotional appearance at the time of the taping. The prosecutor offered to cull a still photograph from the videotape, which would capture the defendant's appearance.

The trial court, after reviewing the videotape, precluded it from being admitted into evidence on the ground that it was inadmissible hearsay.

At trial, the People sought to introduce the defendant's booking photograph into evidence through the testimony of Detective Marshall. Detective Marshall testified that the photograph was a fair and accurate representation of the defendant's appearance from May 13, 2005, through May 16, 2005.

Defense counsel stated that, if the photograph was going to be admitted into evidence, then the defense should be allowed to play the videotape for the jury, so the jury could see what the defendant actually looked like on May 16, 2005. The trial court responded that it would have the prosecutor cull a still photograph from the videotape. Defense counsel strenuously objected, arguing that it was extremely important for the jury to see the videotape, as the voluntariness of the defendant's statements was an important issue in the case. The court responded that a still photograph would be sufficient to show

the defendant's appearance, and directed the prosecutor to cull a still photograph from the videotape. The defendant, however, did not use the still photograph in the presentation of his case.

At trial, the defendant contended that he asked for a lawyer while in police custody, and was involuntarily held at the station house. In support of this position, the defendant sought to introduce into evidence notes that he made while at the station house on May 13, 2005. In one of the notes, the defendant wrote, as translated from Chinese into English, "I was imprisoned for the whole day. For the whole day. That is how American police do. Freedom have not but say have. Yes but say no. No but say yes. He who is involved laughs so loudly, but he who not involved is harassed." Another note written by the defendant states, as translated from Chinese into English, "Everyone say it is I. Do I look like a murderer? Will anyone help me? Heaven and earth help." Defense counsel argued, inter alia, that the notes were admissible as relevant to the issues of whether the defendant remained in the station house voluntarily and whether he wanted the representation of counsel. He also argued that the notes were relevant to the defendant's state of mind at the time the notes were made, and as to whether the defendant's statements were coerced. The trial court did not allow the notes to be admitted into evidence.

In my examination of this case, I find that the delay in the defendant's arraignment was unnecessary and improper. The defendant was at the station house on May 13, 2005, for more than 12 hours, from approximately 7:00 or 8:00 a.m. until after 10:00 p.m., when he was sent home. He returned to the station house the next day, on May 14, 2005, at around 11:00 a.m., was subject to various periods of interrogation throughout the entire day, and was ultimately placed under arrest at 9:30 p.m., more than 10 hours later. Instead of beginning the arraignment process and bringing the defendant into Central Booking, the police held the defendant in custody at the station house for two more days, during which he had no access to a lawyer. The defendant was ultimately arraigned about 28 hours after he was arrested.

Under CPL 140.20 (1), a person arrested without a warrant must, "without unnecessary delay," be processed and brought before a local criminal court, and an accusatory instrument charging him or her with a crime must be filed (CPL 140.20 [1]). In essence, CPL 140.20 (1) requires that "a prearraignment detention not be prolonged beyond a time reasonably necessary to accomplish the tasks required to bring an arrestee to arraignment" (*People ex rel. Maxian v Brown*, 77 NY2d 422,

427 [1991]). The Court of Appeals has recognized that "the steps leading up to arraignment can generally be accomplished well within 24 hours after arrest" (*id.* at 427).

The People have the heavy burden of proving that the defendant's statements were voluntary beyond a reasonable doubt (*see People v Holland*, 48 NY2d 861, 862-863 [1979]). An unnecessary delay in arraignment is one factor to be considered in determining the voluntariness of a confession (*see People v Ramos*, 99 NY2d 27, 34 [2002]; *People v Hopkins*, 58 NY2d 1079, 1081 [1983]; *People v Holland*, 48 NY2d at 862-863). The Court of Appeals has stated that if law enforcement officials deliberately delay the arraignment to procure a confession, that fact has a substantial bearing on a claim of involuntariness (*see People v Ramos*, 99 NY2d at 34; *People v Alex*, 265 NY 192, 195 [1934]).

Upon my reading of the record, I find that the delay in the arraignment was strategically designed so that the defendant could be questioned outside the presence of counsel (*see People v Alex*, 265 NY at 195). The police could have initiated the arraignment process shortly after the defendant's arrest, and should have initiated it, at the latest, on the morning of May 15, 2005, while also investigating Gong and the Fukienese man. Their failure to do so strongly suggests that the defendant's arraignment was delayed for an improper purpose.

Moreover, considering the totality of the circumstances, including the improper delay in the defendant's arraignment and the lengthy period of police interrogation, I find that the People did not satisfy their heavy burden of proving, beyond a reasonable doubt, that the defendant's statements were voluntary (*see People v Anderson*, 42 NY2d 35 [1977]). During his approximately-four-day period of police interrogation, the defendant must have felt that the police had the right to hold him at the station house and that they had "all the time in the world" to question him (*id.* at 39). This conclusion is supported by the notes written by the defendant at the station house on May 13, 2005, which, although hearsay to the extent offered to prove the truth of the matters asserted therein, are relevant to his state of mind (*see People v Ricco*, 56 NY2d 320, 328 [1982]). Accordingly, in my view, that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials should have been granted.

I am also troubled by the fact that, after the hearing court declined to suppress the defendant's statements, the trial court precluded the defendant from introducing into evidence the videotape of the May 16, 2005, interview. In my view, this was

not only legal error, but deprived the defendant of his rights to present a defense and to a fair trial. A criminal defendant's right to present a defense "is a fundamental element of due process of law" (*Washington v Texas*, 388 US 14, 19 [1967]), and is "among the minimum essentials of a fair trial" (*Chambers v Mississippi*, 410 US 284, 294 [1973]).

My analysis in this regard starts with the general premise "that all relevant evidence is admissible unless its admission violates some exclusionary rule" (*People v Scarola*, 71 NY2d 769, 777 [1988]; *see People v Alvino*, 71 NY2d 233, 242 [1987]; *People v Pearce*, 81 AD3d 856, 856 [2011]). "Evidence is relevant if it has any tendency in reason to prove the existence of any material fact, i.e., it makes determination of the action more probable or less probable than it would be without the evidence" (*People v Scarola*, 71 NY2d at 777; *see People v Mateo*, 2 NY3d 383, 424 [2004], *cert denied* 542 US 946 [2004]; *People v Alvino*, 71 NY2d at 241; *People v Pearce*, 81 AD3d at 856). Even where relevant evidence does not violate an exclusionary rule, it may still be excluded in the exercise of the trial court's discretion if its probative value is substantially outweighed by the potential for prejudice (*see People v Mateo*, 2 NY3d at 424; *People v Scarola*, 71 NY2d at 777). Moreover, a trial court's discretion in evidentiary rulings is circumscribed, not only by the rules of evidence, but also by the defendant's constitutional right to present a defense (*see People v Carroll*, 95 NY2d 375, 385 [2000]; *People v Diaz*, 85 AD3d 1047, 1050 [2011], *lv granted* 18 NY3d 882 [2012]; *People v Pitt*, 84 AD3d 1275, 1276 [2011]).

Here, the videotape was relevant to the issue of whether the defendant's statements were voluntary. The videotape shows the defendant's appearance and demeanor on May 16, 2005, after three days of police interrogation. The defendant's appearance and demeanor on May 16, 2005, shed light on whether the defendant was subjected to coercive conditions during his period of police interrogation. Thus, the videotape is relevant to whether the defendant confessed to the murders with a "free and unconstrained" state of mind (*People v Kennedy*, 70 AD2d 181, 185 [1979]).

Contrary to the trial court's determination, the videotape does not constitute impermissible hearsay, because it was introduced for a nonhearsay purpose. "Hearsay is 'a statement made out of court . . . offered for the truth of the fact asserted in the statement'" (*People v Goldstein*, 6 NY3d 119, 127 [2005], *cert denied* 547 US 1159 [2005], quoting *People v Romero*, 78 NY2d 355, 361 [1991] [internal quotation marks omitted]; *see* William Richardson, Evidence § 200 at 176 [Prince 10th ed

1973]). The audio portion of the videotape simply consists of an ADA explaining to the defendant his *Miranda* rights and, once the defendant comprehends that he has a right to speak to a lawyer, the defendant asking for a lawyer. At that point, the interview ends. The defendant did not seek to introduce the videotape to prove the truth of any statements made therein. Rather, the defendant sought to introduce the videotape to show his appearance and demeanor on May 16, 2005, which are relevant to the issue of the voluntariness of his statements. Since the videotape is not being offered to prove the truth of the matters asserted therein, it does not constitute hearsay (*see People v Andrade*, 87 AD3d 160, 164-165 [2011], *cert denied* 565 US —, 132 S Ct 1871 [2012]).

Moreover, in my view, the probative value of the videotape is not substantially outweighed by any potential for prejudice (*see People v Mateo*, 2 NY3d at 424; *People v Scarola*, 71 NY2d at 777). In this regard, I cannot discern any potential prejudice to the People in admitting the videotape into evidence. If the People believe that the videotape does not show that the defendant was subjected to coercive conditions, then they can make that argument to the jury. Indeed, if the People persuasively argue that the videotape shows that the defendant was not malnourished and was in good condition on May 16, 2005, such an argument would strengthen their position that the defendant's statements were made voluntarily.

The People maintain that the defendant is really seeking to use the videotape to show that he did not have a sufficient understanding of the English language to comprehend the *Miranda* warnings, while escaping the trial court's ruling that, if the videotape is offered for such a purpose, then the People can present rebuttal evidence regarding the defendant's understanding of English and that he received *Miranda* warnings in the past.

It is well settled that even when a motion to suppress a statement as involuntarily made has been litigated and decided, a defendant is not precluded "from attempting to establish at a trial that evidence introduced by the people of a pre-trial statement made by him should be disregarded by the jury or other trier of the facts on the ground that such statement was involuntarily made" (CPL 710.70; *see People v Combest*, 4 NY3d 341, 341 [2005]; *People v Kennedy*, 70 AD2d at 185). Indeed, "the defendant may adduce trial evidence and otherwise contend that the statement was involuntarily made. In the case of a jury trial, the court must submit such issue to the jury under instructions to disregard such evidence upon a finding that the state-

ment was involuntarily made" (CPL 710.70). Thus, the defendant may present evidence at trial as to the voluntariness of his statements, even though that branch of his omnibus motion which was to suppress the statements was denied.

Furthermore, the People's argument is undercut by the record, which reveals that defense counsel repeatedly maintained that he was not offering the videotape into evidence for the purpose of demonstrating that the defendant did not sufficiently understand English. In my reading of the record, defense counsel was not being disingenuous on this point. As I see it, the trial court should have admitted the videotape into evidence, while also permitting the People to present rebuttal evidence on the issue of the defendant's understanding of English. This would have protected the defendant's right to present a defense, while allowing the People to rebut any implication that the defendant did not understand the *Miranda* warnings given to him.

Additionally, contrary to the People's contention, a still photograph culled from the videotape by the prosecutor is not an adequate substitute for the admission of the videotape. Significantly, the trial court permitted the prosecutor, and not defense counsel, to cull a photograph from the videotape. Moreover, a still photograph can be very misleading, as it captures only a moment in time. For instance, in one moment, a photograph can capture the defendant's appearance in a way that he appears alert and rested. Conversely, in another moment, a photograph can capture the defendant's appearance in a way that he appears depleted and malnourished. Thus, a single photograph may not accurately represent the defendant's appearance and demeanor during the entire May 16, 2005, interview. As a result, the videotape, as compared to a still photograph, is much better evidence of the way the defendant actually appeared and conducted himself during the May 16, 2005, interview.

By precluding the defendant from introducing the videotape into evidence, the trial court denied the defendant his right to present a defense (*see People v Carroll*, 95 NY2d at 385-387), and, consequently, deprived him of his right to a fair trial (*see Chambers v Mississippi*, 410 US at 294). As the error was of a constitutional magnitude, the error "can be harmless only if the evidence of guilt, without reference to the error, is overwhelming, and there is no reasonable possibility that the error might have contributed to the defendant's conviction" (*People v Harris*, 93 AD3d 58, 71 [2012]; *see People v Crimmins*, 36 NY2d 230, 241-242 [1975]). That is, the error must be harmless be-

yond a reasonable doubt (*see People v Hardy*, 4 NY3d 192, 198 [2005]).

In my view, although the evidence of guilt was overwhelming, there is a reasonable possibility that the error contributed to the defendant's convictions. The videotape bears on the voluntariness of the defendant's confession, an issue which was sure to weigh heavily with the jurors. The defendant was precluded from introducing the videotape for the purpose of allowing the jury to see his appearance and demeanor on the fourth day of police interrogation. This was particularly unfair since the People were permitted to introduce the defendant's booking photograph into evidence, which Detective Marshall testified was a fair and accurate representation of the defendant's appearance from May 13, 2005, through May 16, 2005. The defendant did not have the opportunity to present the videotape to challenge this evidence. Thus, the jury was presented with an unbalanced view of the defendant's physical appearance during his final day of police interrogation. Moreover, it is reasonably possible that the videotape would have created doubt in the minds of the jurors as to whether the defendant's confession was truly voluntary. Therefore, under these circumstances, there is a reasonable possibility that the error might have contributed to the defendant's convictions.

Accordingly, I respectfully dissent, and vote to reverse the judgment, grant that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials, and order a new trial.