THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JAMES CARTER and JEFFREY CARTER, Appellants.

Second Department, May 17, 1982

APPEARANCES OF COUNSEL

*Michael Kennedy, P. C.* (*Sheryl E. Reich* of counsel), for appellants.

*Patrick Henry, District Attorney* (*Marion T. McNulty* of counsel), for respondent.

MOLLEN, P. J.

In the early morning hours of August 18, 1979, a fight erupted outside a bar in Amagansett, New York. The ensuing melee pitted a group of six white men, comprised of bar employees and their friends, against five black patrons. The only criminal prosecution growing out of the incident involved defendants, James and Jeffrey Carter, who were charged with assault in the first degree for allegedly having inflicted serious physical injury upon Robert Peters by means of a dangerous instrument. Peters suffered a broken arm as well as various stab wounds.

On appeal from their assault convictions, the defendants first maintain that they were unconstitutionally subjected to a selective and unlawfully motivated prosecution. They contend that the decision to prosecute them was based largely on their race, and they point out that none of the white participants in the fight, not even the one who admittedly initiated the altercation, was charged with any offense. The defendants further assert that long-standing animosity between them and local police was a contributing factor in the determination to charge them, and no one else, with a crime arising out of the incident. Finally, the defendants argue that they were the victims of discriminatory enforcement of the law since, in Suffolk County, the assault statutes are not generally enforced with respect to so-called barroom brawls.

We reject these arguments, first because they were not properly pursued and preserved at the County Court, and second because they are not supported by the record before us.

As our Court of Appeals has observed: "A claim of discriminatory enforcement does not reach the issue of the guilt or innocence of the defendant and, therefore, is not peculiarly within the province of the trier of fact. It goes, rather, to the more basic threshold question whether the court, as an agency of government, should lend itself to a prosecution which discriminates against the defendant by singling him out for prosecution because of personal animosity, nonconformity, unpopularity, or some other illegitimate reason offensive to our notions of fair play and equal

treatment under the law. This question, like a motion to suppress illegally seized evidence, reaches the very integrity of the judicial and law enforcement processes". (*People v Goodman,* 31 NY2d 262, 269.)

■ Thus, the court held, "the claim of discriminatory enforcement should not be considered as an affirmative defense to the criminal charge, to be determined together with the issue of guilt by the trier of fact, but, rather, should be addressed to the court *before trial* as a motion to dismiss the prosecution upon constitutional grounds." (*People v Goodman, supra,* at pp 268-269; see, also, *Matter of 303 West 42nd St. Corp. v Klein,* 46 NY2d 686; *Matter of Dora P.,* 68 AD2d 719, 732-733; *People v Utica Daw's Drug Co.,* 16 AD2d 12.)

In the case at bar, the defendants made no pretrial motion to dismiss on grounds of selective enforcement. Indeed, the issue is raised for the first time on appeal and, accordingly, it has not been properly preserved for review. Moreover, the defendants' contention that they were the victims of selective enforcement is without merit.

The defendants' argument has at its root an alleged violation of the constitutional guarantee of equal protection of the laws. The Fourteenth Amendment, *inter alia,* prohibits the State from enforcing even a valid law "with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances". (*Yick Wo v Hopkins,* 118 US 356, 373-374.)

Nevertheless, the conscious exercise of some selectivity in the enforcement of the law does not in itself violate the Constitution. Rather, "one who alleges discriminatory enforcement must meet the 'heavy burden' of showing 'conscious, intentional discrimination' * * * or a consciously practiced pattern of discrimination". (*People v Goodman, supra,* p 268.) In the case at bar, there is no evidence that the defendants' prosecution resulted from such conscious discrimination.

■ Assuming, *arguendo,* that it is indeed the prevailing custom in Suffolk County not to lodge assault charges against those who become embroiled in so-called barroom

brawls — a custom from which all others, black and white, who engaged in this brawl apparently benefited — the defendants here were alleged to have been more than mere participants in such a fracas. The evidence reveals that, of all those who took part in the altercation, only the defendants saw fit to employ dangerous instruments. They used a pitchfork and a hoe to break the complainant's arm and to stab him, leaving scarring injuries. The decision to prosecute the defendants, therefore, was predicated on their different and more culpable conduct, and not on any improper or discriminatory consideration. Accordingly, the defendants' constitutional claim of selective enforcement fails on the merits.

Far more troubling, however, is the contention that the defendants were deprived of a fair trial by the improper limitation of their right to cross-examine. At the defendants' joint trial, the court expressed concern that evidence adduced by one defendant not tend to incriminate the other. During the cross-examination of complainant Peters by counsel for defendant James Carter, the following exchanges occurred:*

"Q Now, wasn't your arm cut when you turned around and the pitchfork blade made contact with your arm as you turned into it?

"A No.

"THE COURT: Let me see the lawyers up here on side bar.

"(Discussion at the Bench, off the record, among counsel and the Court.)

"MR. TIERNEY: One moment, your Honor.

"Q Did there come a time that Jeffrey Carter left from in front of you, went someplace else?

"A At the end?

"Q Yes.

"A After I was up against the fence?

"Q Yes.

"A Yes.

"Q And at the time Jeffrey Carter left * * *

---

* James Carter was represented by John Tierney. Jeffrey Carter was represented by Leonard Leeds.

"(Whereupon the following side bar discussion ensued:)

"THE COURT: Just before the last questions, I was off the record with you, with the lawyers, and I told you then about cross-examination with respect to the co-defendant. Now, I'm putting it on the record. I want to advise you again what I told you off the record that I feel it's improper conduct on your part to start to cross-examine with respect to his defendant unless he gives you permission to do it.

"MR. TIERNEY: I understand, your Honor.

"THE COURT: Are you giving him permission to cross-examine on behalf of your client?

"MR. TIERNEY: I am trying to get —

"THE COURT: (Interjecting) I want an answer.

"MR. LEEDS: Only as it relates to his client.

"THE COURT: I am telling you right now I'm going to prevent you from going into delicate questions on cross-examination. If you allow him to continue to ask questions with respect to your defendant, I think you're acting improperly with respect to this defendant.

"MR. TIERNEY: I am trying to set the stage to get away from that so I can talk about —

"THE COURT: (Interjecting) I want the record clear: I have warned you on it officially and told you once off the record, and now I'm telling you on the record."

Later, during the same cross-examination, the following occurred:

"MR. TIERNEY: Excuse me for a moment, your Honor. Judge, may I approach the Bench

"(Whereupon the following side bar discussion ensued:)

"MR. TIERNEY: Your Honor, I wanted to question this witness about the circumstances when he claimed he was struck in the face. However, that puts both of the Carter brothers —

"THE COURT: (Interjecting) You have been all over that.

"MR. TIERNEY: I haven't examined him at all about the end of the stick. He claimed he was stuck later. I haven't questioned him about it. He claims they were both there. I am concerned about your ruling, if I get involved in any questioning about it.

"THE COURT: Just don't convict — all I am telling you is don't convict Jeffrey Carter at the expense — you know, convict him at the expense of your cross-examining him.

"MR. TIERNEY: I take the Court's warning very seriously. I am acting accordingly. What I am concerned about at this stage is questioning anything to do with the circumstances surrounding when the alleged pitchfork was used, when he claims he was jabbed in the face.

"THE COURT: You may have a problem with that, an ethical problem. That is your problem, not mine. I am just pointing it out.

"MR. TIERNEY: My question is, if I ask questions about the circumstances of — my client is alleged to have done something. I don't want to preclude Mr. Leeds from being able to ask questions about the same thing.

"THE COURT: You both have an ethical problem. I am pointing out to you if he doesn't take an objection, he may have a problem, too.

"MR. TIERNEY: I understand that.

"THE COURT: If you both build a hole and both jump in, don't come back later and ask me to bail you out.

"MR. TIERNEY: What I am trying to do: I want to ask the questions about my client at a time when both clients were involved.

"THE COURT: Do whatever you have to do on cross-examination. I am pointing out the difficulties in the area that you are in.

"MR. TIERNEY: You have ruled that if I ask any questions you are not going to let the other attorney.

"THE COURT: I may preclude him unless he makes the appropriate objections.

"MR. TIERNEY: Is there a time that —

"THE COURT: (Interjecting) He's here listening to it, and it's up to him to make the objections on behalf of his client.

"MR. TIERNEY: I understand that. However, there is a time when both parties are alleged to have done something at both times. I want to know if I can go into it before co-counsel?

"THE COURT: Do what you think is appropriate on behalf of your client. That is all I am pointing out to you."

Under the appropriate circumstances, a defendant properly may be required to stand trial together with another individual. (See, e.g., CPL 200.40; *People v Bornholdt,* 33 NY2d 75, 86-87, cert den *sub nom. Victory v New York,* 416 US 905.) But the fact that he may be compelled to submit to a joint trial does not mean or imply that he thereby becomes guardian of the rights and interests of his codefendant. Quite to the contrary, a defendant at a joint trial retains his full panoply of rights, and may pursue his own interests, vigorously defending himself by all means lawfully at his command. Indeed, this is the underlying rationale for cases which have condemned or questioned joint representation of codefendants. (See, e.g., *Holloway v Arkansas,* 435 US 475, 489-490; *Glasser v United States,* 315 US 60, 70; *People v Gomberg,* 38 NY2d 307; *People v Macerola,* 47 NY2d 257, 262.)

Among the courses which a jointly tried defendant may legitimately pursue is to attempt to demonstrate that his codefendant, rather than he, is guilty of the crime charged, or that the codefendant's conduct was more culpable than his own. To this end, and in pursuit of his own interests, a defendant, if he is so advised, may inquire of witnesses concerning the codefendant's alleged participation in the charged crime. The denial of the opportunity to make such relevant inquiry abridges the defendant's constitutional right of confrontation and deprives him of a fair trial. (Cf. *People v Ramistella,* 306 NY 379; *People v Kennedy,* 70 AD2d 181.) And, although the nature and extent of such inquiry is a matter subject to the sound discretion of the Trial Judge (see *People v Schwartzman,* 24 NY2d 241, cert den 396 US 846), the inquiry itself may not be curtailed solely on the ground that it may tend to incriminate the codefendant. In the event that one defendant's attempt to exculpate himself proves unfairly prejudicial to his codefendant, the proper remedy is severance. (See, e.g., *People v La Belle,* 18 NY2d 405.)

In the case at bar, the trial court sternly warned each defense counsel that serious legal and ethical considerations were implicated by cross-examination touching on

the acts of the other's client. This warning, which was taken "very seriously", could not have had other than a chilling effect upon each counsel's willingness to cross-examine vigorously and thoroughly in the area of dispute. In our view, the court's unsolicited intervention was inappropriate and improperly abridged the constitutional rights of both defendants.

The People, however, suggest that, after the court's admonition, both counsel managed to return to and pursue the subject of their desired inquiry. The People argue that therefore reversal is not required because no prejudice is shown. We disagree.

Where the right to cross-examine has been significantly curtailed, reversal will be required even without a showing of specific prejudice. (See, e.g., *United States v Alvarez-Lopez,* 559 F2d 1155, 1160.) Moreover, since "[c]ounsel often cannot know in advance what pertinent facts may be elicited on cross-examination" (*Alford v United States,* 282 US 687, 692), it is sheer speculation to suggest that, notwithstanding the improper restriction of their cross-examinations, the defendants were later able to elicit all they might have, had the warning never been given. (Cf. *Davis v Alaska,* 415 US 308, 319; *Alford v United States, supra,* p 692.) Accordingly, a new trial is necessary.

We have considered the remaining contention, made by defendant Jeffrey Carter, and find it to be without merit.

LAZER, O'CONNOR and BRACKEN, JJ., concur.

Appeals by the defendants from two judgments (one as to each of them) of the County Court, Suffolk County, the first (against Jeffrey Carter) rendered July 29, 1980, the second (against James Carter) rendered September 3, 1980, convicting each of them of assault in the first degree, upon a jury verdict, and imposing sentences.

Judgments reversed, on the law, and new trial ordered.