OPINION OF THE COURT
Harold J. Rothwax, J.
These defendants have been charged in 11 separate indict *988 ments with engaging in a scheme whereby they, as landlords, would hire a common group of coconspirators headed by two men, Morris Lender and Harmon Lambert, to forcibly remove legal tenants from their apartments in order to vacate the buildings in which the tenants lived, for resale and at great profit to the defendants. These indictments are the result of an investigation in which the members of the Lender-Lambert group were first charged with conspiracy, burglary and related crimes, to which charges the majority of the group members pleaded guilty and subsequently became State’s witnesses. Consequently, all but three of the defendants face multiple indictments, a series having been voted prior to and another subsequent to the receipt of accomplice testimony. Each of the defendants is charged with having conspired with the Lender-Lambert group to commit burglary, grand larceny and/or coercion and with substantive offenses of coercion, grand larceny and burglary in regard to specific tenants. The court addresses the issues common to all of the defendants’ omnibus motions, as follows:
LEGAL SUFFICIENCY OF THE EVIDENCE
The court has reviewed the minutes of the Grand Jury proceedings (CPL 210.30) underlying each indictment and finds the evidence sufficient in each instance to support the conspiracy, grand larceny and coercion counts.
The evidence sufficed to establish, in each instance, an agreement between the landlord defendants and Lender and Lambert, whereby the latter would harass, intimidate and commit crimes against tenants of the landlord in order to frighten such tenants into vacating their apartments. Lender and Lambert were to be paid a fixed amount, ranging from $500 to $1,500, per tenant, who abandoned his apartment. Pursuant to these agreements, Lender and Lambert would move a group of people recruited by them for this purpose, into vacant apartments with the landlord’s assistance. These recruits in turn would destroy property belonging to the legal tenants by vandalism, flooding and other means; would break into and ransack apartments of legal tenants; would threaten, intimidate, harass and occasionally assault the legal tenants; and would generally do their utmost to make the building unlivable. Lender and Lambert also installed some of the recruits as superintendents, with the instruction to commiser *989 ate with the tenants, to suggest that they move, but not to effect repairs or otherwise interfere with the operation of the plan. The recruits received lodging for the period of the operation. The "supers” received a fee. Lender and Lambert were paid for each tenant who vacated his apartment. The landlords obtained vacant and significantly more valuable property for resale.
In the initial series of indictments, proof of the landlord defendants’ participation in the plan was circumstantial, consisting of evidence of their knowledge of the operation and their acquiescence, in the form of visits to the premises or to other premises with Lender and/or Lambert; of cooperation in making apartments available at nominal or no rent to coconspirators, and in assisting the group in relocating; of efforts to disassociate themselves from the premises during the period of operation by, for example, pretending to have sold to Lender or Lambert; by the actual sale of the building after the operation; and, decisively, by the evident pattern of the methods of the Lender-Lambert group in regard to several buildings owned by the same defendant over an extended period of time. (See, e.g., People v Ozarowski, 38 NY2d 481 [1976].) Once the testimony of their coconspirators became available, there was direct evidence of the agreement each landlord had with Lender and Lambert in regard to particular buildings, which evidence was corroborated by the foregoing circumstantial evidence. (See, e.g., People v Sabella, 35 NY2d 158, 168-169 [1974].) The evidence established, prima facie, that each defendant individually agreed with Lender and Lambert that conduct amounting to burglary, larceny and coercion be committed by the Lender-Lambert crews (Penal Law § 105.00 et seq.).
LARCENY
The defendants contend that, regardless of the proven nature of the agreements, the alleged facts are insufficient to establish larceny as a matter of law, based upon the forcible removal of tenants from premises owned by the accused. The court upholds the grand larceny counts.
Certainly, the defendants’ ownership of the premises alleged to be the subject of larceny does not preclude prosecution. Since larceny is an offense against the rightful possession of property, title is not dispositive. (People v Hutchinson, 56 NY2d 868, 869 [1982]; People v Izzo, 96 Misc 2d 634, 635 [Bronx Crim Ct 1978]; Perkins, Criminal Law, Larceny § B [1], *990 at 238-239 [2d ed 1969].) An owner for purposes of the larceny statute is "any person who has a right of possession * * * superior to that of the [thief]” (Penal Law § 155.00 [5]). Thus, for example, the lawful possession of property is an interest "superior” to a security interest in the property "even if legal title lies with the holder of the security interest pursuant to a conditional sales contract or other security agreement” (Penal Law § 155.00 [5]; compare, Borgen v State, 56 Md App 521, 527, 468 A2d 390, 393, n 4 [1983]).
The general principle has been succinctly stated thusly: "[I]f personal property in the possession of one other than the general owner by virtue of some special right or title is taken from him by the general owner, such taking is larceny if it is done with the felonious intent of depriving such person of his rights * * * Thus, one having the property in goods may be guilty of stealing them from one to whom he has given them in custody as a special possession, as in the case of a lawful lien, pledge, bailment or levy of legal process. 2 Wharton’s Criminal Law, 12th Ed., section 1177.” (Trevathan v Mutual Life Ins. Co., 166 Ore 515, 520, 521, 113 P2d 621, 623, 624 [1941]; see also, People ex rel. Travis v Sheriff, 275 App Div 444, 446 [3d Dept 1949]; People v Walden, 124 Misc 2d 615, 620, n 4 [Sup Ct, NY County 1984]; Palmer v People, 10 Wend 165,166 [1833]; State v Parker, 104 Utah 23, 137 P2d 626, 628-629 [1943]; Larceny by Owner, Ann., 58 ALR 330.)
In the court’s opinion, a leasehold qualifies as a special property interest in the leased premises. "A residential lease is now effectively deemed a sale of shelter and services by the landlord” (Park W. Mgt. Corp. v Mitchell, 47 NY2d 316, 325 [1979]).[1] This sale gives the tenant a contractual right to possession of the premises, which cannot be divested by the landlord except in accordance with applicable statutes. (See, e.g., Fisher v Velasquez, 126 Misc 2d 24, 28-29 [Civ Ct, Kings County 1984]; New York City Rent and Eviction Regulations; Real Property Law, art 7, §§ 223-b, 232-a, 232-c, 235, 235-b, 235-d; RPAPL arts 7, 7-A.) The premises at issue were invari *991 ably governed by rent stabilization laws limiting the grounds upon which tenancies may be terminated and declaring lease provisions which are inconsistent to be void. (See, e.g., Fernandez v Tsoumpas Bros., 126 Misc 2d 430, 432 [Civ Ct, NY County 1984]; Code of Rent Stabilization Association of New York City, Inc. §§ 53, 54, 10,11; Administrative Code of City of New York § Y51-6.0 [a], [b].) The same law creates a vested interest in the tenant by requiring a landlord to offer to renew any residential lease "at a rent not in excess of the stabilization rent * * * and otherwise on the same conditions as the expiring lease”. (Code of Rent Stabilization Association of New York City, Inc. § 60; see, e.g., 1202 Realty Assoc. v Evans, 126 Misc 2d 99, 101 [Civ Ct, Kings County 1984].) Despite limitations upon the absolute right to dispose of a leasehold as, for example, by assignment (see, e.g., Sitomer v Melohn Props., 108 AD2d 706, 707 [1st Dept 1985]), the basic characteristic of a tenancy continues to be the contractual right to possess the premises exclusive of the entire world for the term of the lease (see, e.g., Schnee v Jonas Equities, 109 Misc 2d 221, 222 [App Term 1981]; Rochester Poster Adv. Co. v State of New York, 27 Misc 2d 99, 101 [Ct Cl 1961]). Thus, even under modern precepts, a tenant can, for example, maintain an action against the landlord for trespass. (See, e.g., State v Greenwald, 446 A2d 44 [Me 1982] [burglary]; State v Bailey, 25 NC App 412, 213 SE2d 400, 402 [1975].) The tenant must, therefore, be regarded as the "owner” of the premises for purposes of the larceny statute. (Penal Law § 155.00 [5].)
The defendants nonetheless contend that a leasehold is not the sort of personal property which is susceptible of larceny. In support of their position, the defendants rely upon dicta in the case of People v Ashworth[2] (220 App Div 498, 502 [4th Dept 1927]) where the court stated: "It is reasonably clear * * * that all intangible personal property is not the subject of larceny, at least under * * * the Penal Law as now worded * * * A leasehold interest in land is personal property * * * But there can be no larceny of such an interest or right.”
The court cited no precedent for this dicta, apparently *992 relying upon general principles of common-law larceny and upon then prevailing statutory definitions of personal property. Under the common law, property in order to be subject to larceny had to " 'have [a] corporeal existence, that is, be something the physical presence, quantity, or quality of which is detectable or measurable by the senses or by some mechanical contrivance [and not be] a naked right existing merely in contemplation of law, although it may be very valuable’ ” (220 App Div, at p 502). Under the contemporary statutes of 1927, personal property was defined as "chattels, money, things in action, and all written instruments themselves, as distinguished from the rights or interests to which they relate” (General Construction Law § 39 [1]; emphasis added). In short, a document such as a lease or contract could be stolen, but the rights or entitlements which it embodied could not. (See, eg., People ex rel. St. George v Owen, 271 App Div 313 [4th Dept 1946], revg 186 Misc 561; Keller v United States, 168 F 697, 698 [7th Cir 1909]; People v Sansanese, 17 NY2d 302, 305 [1966]; Larceny — Realty, Ann., 131 ALR 146, 154.)
The revised Penal Law significantly broadened the definition of property subject to larceny by including "any article, substance or thing of value * * * which is provided for a charge or compensation.” (Penal Law § 155.00 [1]; see, eg., People v Seymour, 55 AD2d 737 [3d Dept 1976]; People v Parga, 188 Col 413, 535 P2d 1127, 1128-1129 [1975] [Model Penal Code].) Moreover, the statute includes within the concept of asportation "bringing about of a transfer or purported transfer of property or of a legal interest therein” (Penal Law § 155.00 [2]; emphasis added), which was intended to extend the concept of larceny to the constructive acquisition of property. (Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 155.00, p 103; cf. People v Ashworth, 220 App Div, at p 501; see also, People v Zakarian, 121 Ill App 3d 968, 460 NE2d 422, 426 [1984].) Hence, under modern statutory principles, the transfer of a legal interest in a thing of value, with the requisite intent, may constitute larceny.
As previously discussed in relation to ownership, a leasehold is "a legal interest” (see, eg., Schnee v Jonas Equities, 109 Misc 2d, at p 222). It is, moreover, an interest in a "thing,” an apartment, which "is provided for a charge or compensation” (Penal Law § 155.00 [1]).
The element of asportation is also present in the forcible removal of the tenant from lawful occupancy of the apart *993 ment. This is the implicit holding of People v Spatarella (34 NY2d 157 [1974]) wherein the court upheld the defendant’s conviction for larceny by extortion based upon his threats against the person of one Ugenti, intended to force Ugenti to relinquish a customer of his refuse collection business to Spatarella. Noting that the intangible right to conduct a business or pursue employment had long been considered property subject to threat in an extortionate demand for money, the court held that the same interests qualify as property which can be effectively taken from their owners by threats (34 NY2d, at p 162; see also, Extortion — What Constitutes "Property”, Ann., 67 ALR3d 1021, 1024, § 3). A tenant’s contractual right to possession has been held subject to conversion in other contexts. In the law of torts attempts by third parties to force tenants to abandon their leaseholds have been held to constitute wrongful interference with the contractual personal property rights of the landlord. (Prosser, Torts, Interference with Contractual Relations § 129, at 936, nn 20, 24, 25; id., at 931, n 67 [4th ed 1971]; see also, White v Masse, 202 Iowa 1304, 211 NW 839, 66 ALR 1434, 1438 [1927]; Posner Co. v Jackson, 223 NY 325, 332 [1918].) In the law of eminent domain, it has been held that the State takes the tenant’s property when it deprives him of the beneficial use or value of his lease, even though the landowner’s title and possession are unaffected. (Rochester Poster Adv. Co. v State of New York, 27 Misc 2d, at p 102; Baker v State of New York, 63 Misc 549, 550 [Ct Cl 1909]; People v Thornton, 122 App Div 287, 288 [3d Dept 1907]; EDPL 103 [F] [L 1977, ch 839, § 1]; cf. Modjeska Sign Studios v Berle, 43 NY2d 468, 477 [1977].)
The court does not mean to imply by its holding that every contractual right or interest may be subject to larceny. (Cf. People v Keeffe, 50 NY2d 149, 157 [1980].) Thus, for example, there is a distinction between the contractual right to receive a commodity, which is a service, and the actual possession of the commodity as property. (People v Neiss, 73 AD2d 938, 939 [2d Dept 1980]; Penal Law § 165.15.) Not every contractual interest is of a possessory nature, or exists in relation to an identifiable and specific "article, substance or thing”. (Penal Law § 155.00 [1].) Nonpossessory or indefinite interests are not property susceptible of larceny. (People v Keeffe, 50 NY2d, at p 157; compare, Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 165.15, p 226.)
The foregoing is the basis of distinction between a contract for the temporary use of premises at will, which is a license, *994 and the contract for exclusive possession of particular premises for a specified term, which is a lease. (Rochester Poster Adv. Co. v State of New York, 27 Misc 2d, at p 101.) The former arrangement, from the landowner’s perspective, constitutes the provision of a service (Penal Law § 165.15 [2]) insofar as it does not create in the licensee a right of possession exclusive of the landlord, who may substitute premises or may recover the premises altogether at any time without resort to judicial process. (See, e.g., Mann v 125 E. 50th St. Corp., 124 Misc 2d 115 [Civ Ct, NY County 1984]; see, e.g., Tenant, Lodger and Guest: Questionable Categories for Modern Rental Occupants, 64 Yale LJ 391, 392-393 [1955]; Cooper v Schirrmeister, 176 Misc 474 [NY City Ct 1941]; Roberts v Casey, 36 Cal App 2d 767,93 P2d 654, 657 [1939].) The latter arrangement constitutes a transfer of property to the lessee. (Park W. Mgt. Corp. v Mitchell, 47 NY2d, at p 324.)[3]
Although it appears that prosecution of a landlord (compare, Frankfurt v District of Columbia, 65 AD2d 197 [DC Mun App 1949]) for theft of premises to which he holds title is unusual, it is entirely consistent with the foregoing general principles. The landlord who conveys exclusive possession of his premises to a purchaser for value is no less culpable if he attempts to recover the premises before he is entitled to do so than are those who pledge property as security, incur debts to a bailee, or conditionally sell a chattel, and who thereafter repossess the property without discharging their obligation or complying with lawful procedure. All are guilty of larceny of another’s possessory interest, despite their title to the thing reclaimed. (See, e.g., State v Parker, 104 Utah 23, 137 P2d, at pp 628-629, 631 [concurring opn]; People v Walden, 124 Misc 2d 615, 620 [Sup Ct, NY County 1984], supra; Hudiburg Chevrolet v Globe Indem. Co., 394 SW2d 792, 795 [Tex 1965]; Penal Law § 155.00 [5].)
*995 The defendants’ further argument, that as to those counts relating to tenants who accepted payments of money in conjunction with vacating their apartments there can be no larceny, is unpersuasive. While a tenant may undoubtedly agree in effect to sell the balance of his leasehold back to the landlord, such an arrangement presumes that the tenant acted voluntarily and not under duress. The form of larceny charged here is extortion. The essence of extortion is obtaining property from the rightful owner by compulsion in the form of threats to do harm to some person or damage to property. (Penal Law § 155.05 [2] [e].) The Legislature has specifically excluded extortion from the allowable means by which property may be "appropriated [by] a claim of right made in good faith.” (Penal Law § 155.15 [1].) In other words, a transaction which might have been legitimate if entered upon voluntarily by the parties may nonetheless be criminal when provoked by force (see, e.g., People v Banks, 55 AD2d 795 [3d Dept 1976]; see also, People v Woods, 41 NY2d 279, 281 [1977]). The Legislature has also recognized that the receipt of something of value by the victim of extortion in the course of the extortionate transaction is not necessarily a defense. (Penal Law § 155.10; see, Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 200.15, pp 418-420; People v Kacer, 113 Misc 2d 338, 340-341 [Sup Ct, NY County 1982].) Evidence of the payments, which was before the Grand Jury, is certainly admissible and relevant with regard to the issue whether the defendants "wrongfully intended to take [the tenants’] property * * * That is * * * that the defendant^] [were] aware that [their] act of taking the owner’s property was without the latter’s authority or consent” (People v Ricchiuti, 93 AD2d 842, 844 [2d Dept 1983]), which is a jury question.
In most instances, there were specific threats, acts of violence and destruction of property directed at each complainant. In those instances where there were no explicit threats, the court finds that the alleged intentional conduct of the defendants created an atmosphere of coercion designed to deprive the tenants of their apartments. (Compare, People v Court, 52 AD2d 891, 892 [2d Dept 1976], affd 43 NY2d 817; People v Kacer, 113 Misc 2d, at p 346.)
EXCLUSIVITY
The defendants, relying primarily upon the Court of Ap *996 peals opinion in People v Valenza (60 NY2d 363 [1983]), argue that State statutes and Administrative Code provisions governing landlord-tenant relations are to be applied exclusively to the facts at issue, in effect preempting any criminal proceeding. The court rejects this argument for a number of reasons.
The lynchpin of the Valenza decision was the court’s finding, upon evaluating the State’s statutory scheme in regard to collection of sales taxes, that the relevant enforcement provisions of the Tax Law (§ 1145 [a], [b]) provided substantial civil penalties and no criminal sanction for failing to remit sales taxes collected on behalf of the State, thus "manifesting] an intent to exclude such conduct from criminal prosecution” (60 NY2d, at p 372). The court held that the integrated scheme of the Tax Law cast doubt on whether the power to maintain a criminal prosecution under a separate statute had been vested in the prosecutor.[4]
No such ambiguity exists in the Administrative Code or the State enabling statutes in regard to rent-stabilized multiple dwellings. The New York City Rent and Rehabilitation Law (Administrative Code § Y51-1.0 et seq.) governing rental and eviction proceedings in the city specifically prohibits the use of harassing tactics to cause a tenant to vacate the premises or to waive any rights of tenancy. Specifically prohibited is "any course of conduct including, but not limited to, interruption or discontinuance of essential services which interferes with or disturbs or is intended to interfere with or disturb the comfort, repose, peace or quiet of such tenant in his use or occupancy” (Administrative Code § Y51-10.0 [d]). The enforcement provisions of the code authorize the city rent agency to apply to enjoin such practices; to impose civil monetary penalties; to seek damages for failure to comply with administrative orders; to freeze rents; and, first and foremost, to seek criminal prosecution, through the aegis of "the district attorney having jurisdiction,” of any willful violation of section Y5110.0 which is declared to be "a crime * * * subject to a fine of not more than five thousand dollars, or to imprisonment * * * for not more than one year”. (Administrative Code § Y51-11.0 [a].) Obviously,, the legislative intent was not to limit punish *997 ment for conduct of the sort at issue here to civil penalties or agencies.
In addition to the foregoing provision, a recently enacted amendment to the Administrative Code (Local Law, 1982, No. 56 of City of New York, as amended by Local Law, 1984, No. 40 of City of New York) created the class A misdemeanor of unlawful eviction:
"Unlawful eviction. — a. It shall be unlawful for any person to evict or attempt to evict an occupant of a dwelling unit * * * except to the extent permitted by law pursuant to a warrant of eviction or other order of a court of competent jurisdiction or a governmental vacate order by:
"(1) using or threatening the use of force to induce the occupant to vacate the dwelling unit; or
"(2) engaging in a course of conduct which interferes with or is intended to interfere with or disturb the comfort, repose, peace or quiet of such occupant in the use or occupancy of the dwelling unit, to induce the occupant to vacate the dwelling unit including, but not limited to, the interruption or discontinuance of essential services; or
"(3) engaging or threatening to engage in any other conduct which prevents or is intended to prevent such occupant from the lawful occupancy of such dwelling unit or to induce the occupant to vacate the dwelling unit including, but not limited to, removing the occupant’s possessions from the dwelling unit, removing the door at the entrance to the dwelling unit; removing, plugging or otherwise rendering the lock on such entrance door inoperable; or changing the lock on such entrance door without supplying the occupant with a key.” (Administrative Code § D16-1.01.)
The newly enacted provision specifies that "[t]he remedies and penalties provided * * * shall be in addition to any other remedies and penalties provided under other provisions of law” (Administrative Code § D16-1.09; emphasis added).
It has long been recognized in other similar contexts that simply because an administrative code or other regulatory scheme deals with the conduct at issue "does not mean that its application is exclusive as to all other statutes penal in nature” (People v Sansanese, 17 NY2d 302, 305 [1966] [Vehicle and Traffic Law], supra; People v Wisch, 58 Misc 2d 766, 769 [Sup Ct, NY County 1969] [General Business Law]; see, People v Eboli, 34 NY2d 281, 285). As the Court of Appeals noted in a related context, "[h]ousing codes do not provide a complete *998 delineation of the landlord’s obligation, but rather serve as a starting point in that determination by establishing minimal standards” (Park W. Mgt. Corp. v Mitchell, 47 NY2d, at p 328).
The conduct at issue here, while similar to the deprivation of services and harassment which form the basis of misdemeanor prosecution for unlawful eviction, so exceeds the conduct there enumerated (Administrative Code § D16-1.01 et seq; § Y51-10.0 [d]) in terms of scope and degree as to rise to a greater level of criminality calling for greater severity in treatment (People v Eboli, supra, at p 289). Therefore the defendants cannot successfully complain of lack of notice amounting to a violation of due process of law. The defendants did not "choose between a lawful act and an unlawful one, but between two unlawful acts of different degrees” (People v Cruz, 48 NY2d 419, 427, n [1979]).
The serious nature of the conduct here alleged also distinguishes it from civil proceedings upon which the defendants predicate their claim of selective prosecution (see, e.g., People v Carter, 86 AD2d 451, 454 [2d Dept 1982]). These defendants employed a group whose profession was, in effect, to forcibly expel entire communities of tenants from their lawful occupancies by a form of wholesale criminal assault, using means which were often criminal in and of themselves, apart from the objectives of the conspiracy (cf., e.g., Matter of Meko Holding v Joy, 107 AD2d 278 [1st Dept 1985]; compare, 111 E. 88th Partners v Simon, 127 Misc 2d 74, 75 [App Term, 1st Dept 1985]). The defendants, in any event, have made no factual showing in support of this claim (Matter of 303 W. 42nd St. Corp. v Klein, 46 NY2d 686, 695-696 [1979]).

. Because modem residential leases are regarded as contracts for the sale of shelter and services and are no longer regarded as conveyances of realty (Park W. Mgt. Corp. v Mitchell, 47 NY2d 316, 324), the inclusion of "real property” within the definition of property subject to larceny is not dispositive of the instant cases. (Penal Law § 155.00 [1]; Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 155.00, p 103; cf. Larceny — Realty, Ann., 131 ALR 146, 154; Real Property Law former § 33.)

. People v Ashworth (220 App Div 498) held that the unauthorized use of machinery and workmen to spin wool for sale did not constitute larceny under the former Penal Law, insofar as the use of the equipment and labor was not property. The specific holding in Ashworth has been addressed by enactment of theft of services statutes. (Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 165.15, p 226; People v Weg, 113 Misc 2d 1017,1021 [Grim Ct, Kings County 1982].)

. The law now exacts from landlords warranties of fitness and habitability formerly restricted to innkeeper-transient relationships (Park W. Mgt. Corp. v Mitchell, 47 NY2d 316, 325; cf., e.g., Marden v Radford, 229 Mo App 789, 84 SW2d 947, 958 [1935]; 64 Yale LJ 391, 399-400), and, therefore, reserves to landlords the right to enter for purposes of making repairs. Some courts formerly used this right of entry as a basis of distinction between tenancies and transient license arrangements. The principal basis of distinction upon modern precepts is the intention of the parties to the agreement on the one hand to convey exclusive or less than exclusive possession, and on the other to take possession permanently or transitorily. (Park W. Mgt. Corp. v Mitchell, supra, at p 325; Mann v 125 E. 50th St. Corp., 124 Misc 2d 115, 117; see, People v Walden, 124 Misc 2d 615, 618-619 [Sup Ct, NY County 1984].)

. The section has since been amended (L 1984, ch 575, § 1) specifically to permit prosecution under the State Penal Law and under any local law adopted pursuant to the authority of the Tax Law (see, People v Walsh, 108 AD2d 464 [2d Dept]).